# EXHIBIT 3
# 9/28/12 ZAVIN DECLARATION
# CASE NO. 12-4175-WHP

INTERCOM POLAND, LLC
LIMITED LIABILITY COMPANY AGREEMENT

This Operating Agreement (this "**Agreement**") is entered into effective as of this 30th day of November, 2010 by and between DBPOL LLC, an Illinois limited liability company ("**DBPOL**"), INTERCOM VENTURES POLAND LLC, an Illinois limited liability company ("**Intercom**"), and ROUND GROVE LLC, a Delaware limited liability company ("**Round Grove**").

WHEREAS, the parties have agreed to organize and operate a limited liability company in accordance with the terms of, and subject to the conditions set forth in, this Agreement;

NOW, THEREFORE, for good and valuable consideration, the parties, intending legally to be bound, agree as follows:

ARTICLE I
DEFINED TERMS

1.1     The following capitalized terms shall have the meanings specified in this *Article I*. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

*"Affiliate"* means, with respect to any Member, any Person: that directly, or through one or more intermediaries, controls or is controlled by or is under common control with a Member; any Person that is an officer, director, partner, member, principal, manager or trustee of or serves in a similar capacity with respect to a Member, or any Entity in which a Member, directly or indirectly through one or more intermediaries, is a partner, principal, shareholder, member, beneficiary or otherwise an owner. For all purposes of this Agreement, the term "control" and variations thereof will mean possession of the authority to direct or cause the direction of the management and policies of the applicable Entity, through the direct or indirect ownership of equity interests therein, by contract, voting trust or otherwise.

*"Appraiser"* means an appraisal firm that (i) is nationally recognized as knowledgeable and experienced and has been actively engaged in providing valuation services in connection with the acquisition, disposition, and capitalization of entities comparable to the Company, for a period of no less than the immediately preceding five (5) years, and (ii) is not an Affiliate of any Member.

*"Approved Expenses"* means the costs or expenses that are reasonably necessary to achieve the Purpose.

*"Bankruptcy"* shall have the meaning ascribed to it in Section 18-101 of the Act.

*"Capital Account"* means the account maintained by the Company for each Interest Holder in accordance with the Section 3.6.

*"Capital Contribution"* means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

*"Code"* means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

*"Company"* means the limited liability company organized in accordance with this Agreement.

*"Dilution Event"* shall have the meaning given to it in Section 3.7.

*"Economic Interest"* means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

1



CONFIDENTIAL

DB0002349

*"Interest Holder"* means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member.

*"Involuntary Withdrawal"* means, with respect to any Member, death, Bankruptcy, court declaration of incompetence, or dissolution, termination of existence or liquidation.

*"Member"* means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company.

*"Membership Rights"* means all of the rights of a Member in the Company, including a Member's: (i) Economic Interest; (ii) right to inspect the Company's books and records; (iii) right to participate in the management of and vote on matters coming before the Company; and (iv) unless this Agreement or the Certificate of Formation provide to the contrary, right to act as an agent of the Company.

*"Negative Capital Account"* means a Capital Account with a balance of less than zero.

*"Net Cash"* means all gross receipts derived by the Company, including cash Funds derived from operations of the Company (including interest received on reserves) without reduction for any non-cash charges, but less cash funds used to establish reasonable reserves for future expenses, debt payments under any Company Loans, capital improvements for replacements as determined by the Members, and any amounts required to repay in full any Member Loans. Net Cash shall be increased by the reduction of any reserve previously established. Net Cash shall be decreased by costs paid by the Company in connection with sales of assets outside the ordinary course of the Company's business, including brokers' commissions, and by costs paid by the Company in connection with financing and refinancing.

*"Percentage Interest"* means, as to the Members: Intercom – 72.5%, DBPOL – 25%, and Round Grove – 2.5% (subject to adjustment subsequent to the occurrence of the Dilution Event as determined in the manner described in Section 3.7); and as to an Interest Holder who is not a Member, the Economic Percentage Interest of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Economic Interest.

*"Person"* means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

*"Profit"* and *"Loss"* means, for each taxable year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with the Code adjustments:

(i)      all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

(ii)      any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

(iii)      any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

(iv)      gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

(v)      in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

2

CONFIDENTIAL

(vi)    notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

*"Purpose"* means the purpose of the Company as described in Section 2.3, below.

*"Regulation"* means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

*"Risk Premium"* shall have the meaning set forth in Section 3.1.4, below.

*"Shift Date"* means the date that all Capital Contributions and any Risk Premium due in connection therewith are paid in full.

*"Transfer"* means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means voluntarily to sell, hypothecate, pledge, assign, or otherwise transfer.

*"Voluntary Withdrawal"* means a Member's dissociation with the Company by means other than a Transfer or an Involuntary Withdrawal.

*"Voting Percentage Interest"* means (i) prior to the Shift Date:   Intercom – 22.5%, DBPOL – 75%, and Round Grove – 2.5%; and (ii) subsequent to the Shift Date:   Intercom – 72.5%, DBPOL – 25%, and Round Grove – 2.5%.

## ARTICLE II
### FORMATION AND NAME; OFFICE; PURPOSE; TERM

2.1.    *Organization.* The parties hereby organize a limited liability company pursuant to the Delaware Limited Liability Company Act, as amended from time to time (the "**Act**") and the provisions of this Agreement and, for that purpose, have caused a Certificate of Formation to be prepared, executed and filed with the Secretary of State of Delaware (the "**Secretary**") on August 2, 2010.   The Company is established by the parties in reliance upon each party's respective undertaking to either make Capital Contributions or deliver certain expert services in support of the operation and potential success of the Company, as set forth below.   The rights and obligations of the Members will be as provided in the Act except as otherwise expressly provided in this Agreement.   The Members agree to execute such certificates or documents and to do such filings and recordings and all other acts, including the filing or recording of any amendments to the Certificate of Formation and any assumed name filings in the appropriate offices in any other applicable jurisdictions as may be required to comply with applicable law.

2.2.    *Name of the Company.* The name of the Company shall be Intercom Poland, LLC.   The Company may do business under that name and under any other name or names upon which the Members agree. If the Company does business under a name other than that set forth in its Certificate of Formation, then the Company shall comply with applicable provisions of the Act.

2.3.    *Purpose.* Subject to the terms and conditions contained in this Agreement, the purpose and scope of business of the Company will be to produce and deliver packaged media content (comprised primarily of Poland-based media content) for distribution over a newly created network using Internet Protocol Television ("**IPTV**") and set top boxes ("**STBs**").   The STBs, along with any related infrastructure, software, hardware and technology, are collectively referred to herein as the "**Tech Assets**".   The purpose and scope of the business of the Company will also include all necessary or advisable actions in connection with the foregoing to carry out such purposes, and otherwise to enter into, perform and participate in such activities as may be duly authorized pursuant to this Agreement in connection with the foregoing activities. The Company will enter into such other agreements, do all such things as will be desirable or necessary in connection with, and undertake any and all business or activity in order to carry out the purposes of the Company, as determined from time to time in accordance with the applicable provisions of this Agreement.   Notwithstanding anything to the contrary herein contained,

3

DB0002351

this Agreement will not be deemed to create a partnership relationship between the Members with respect to any activities whatsoever, and instead each Member's relationship to the others will be that of a member under the Act. Except as specifically provided herein, this Agreement will not constitute any Member the agent of any other Member.

2.4.   *Term.* The term of the Company began upon the filing of the Certificate of Formation by the Secretary and shall continue perpetually until terminated, dissolved or liquidated pursuant to this Agreement.

2.5.   *Registered Office; Principal Place of Business/Agent.* The registered office of the Company in the State of Delaware shall be located at 615 South DuPont Highway, Dover, Delaware 19901. The name of the Company's registered agent in the State of Delaware shall be National Corporate Research, Ltd. The principal office of the Company shall be located at 350 N. LaSalle Boulevard, Suite 1000, 10th Floor, Chicago, Illinois 60654.

**ARTICLE III**
**MEMBERS; CAPITAL; CAPITAL ACCOUNTS**

3.1.   *Capital Contributions.*

3.1.1.   <u>DBPOL Mandatory Capital Contribution.</u> As consideration for its Membership Interest, DBPOL will provide capital to the Company of up to ████████████████████ as and when needed (the "**Initial Capital Contribution**").

3.1.2.   <u>Company Loans.</u> To the extent that a loan is supported by the assets of the Company, the Company may obtain a loan to fund the costs associated with the Company (each, a "**Company Loan**"). Any Company Loan (i) may only be obtained from a commercial lender in the business of making such loans and shall not be from any lender that is related to or affiliated with any Member hereunder (or its constituent members, partners or ultimate interest owners); (ii) shall be on market rate terms and conditions; and (iii) may not contain terms that may dilute or adversely affect another Member's Economic Interest. If any of the foregoing are not satisfied, then the prior written consent of all Members shall be required as a condition precedent to any such loan. No Person, however, will be required to personally, or otherwise, guaranty any obligations of the Company. In the event the Company is considering obtaining a Company Loan, DBPOL will have a right of first refusal to provide financing to the Company on the same terms as are available to the Company. In addition, Members may make loans to the Company on terms agreed to by the unanimous consent of the Members, which may be withheld in any Member's sole and absolute discretion for any reason or for no reason ("**Member Loans**").

3.1.3.   <u>Additional Capital Contributions.</u> To the extent additional capital is required in addition to (i) the Initial Capital Contributions, (ii) the capital from Company revenues, and (iii) Company Loans; each Member has the right, but not the obligation, to contribute the additional required capital in proportion to their Percentage Interest pursuant to the terms of this Agreement (such amounts, "**Follow-On Capital Contributions**"). All Follow-On Capital Contributions (to the extent agreed to be contributed by the Members) will be contributed on an "as and when needed" basis. In the event that any Member obtains a personal loan as a source of any of their capital contributions, the Company will not be responsible for any costs or interest associated with the loan; it being the intent that the only obligation of the Company with respect to Capital Contributions is to return the Capital Contributions plus any applicable Risk Premium. The Initial Capital Contributions, along with any Follow-On Capital Contributions are collectively referred to herein as the "**Capital Contributions**".

3.1.4.   <u>Risk Premium.</u> The Members will be paid a risk premium equal to a fifty percent (50%) fixed return on all Capital Contributions (the "**Risk Premium**"). The Risk Premium shall be calculated by multiplying the total amount of the Capital Contributions made from time to time by

4

fifty percent (50%). For example, if DBPOL makes a total of $1,000,000 in Capital Contributions, then the Risk Premium due in connection with such Capital Contributions shall be $500,000 ($1,000,000 x .50).

     3.1.5. _Intercom._ As consideration for its Interest, Intercom shall provide on an ongoing basis its expertise in providing IPTV service to customers and developing IPTV systems; provided that nothing contained herein shall obligate Intercom to provide anything other than its expertise. Intercom shall not be required to provide any monetary capital contributions to the Company.

     Any third party vendors will be engaged by contract directly with Intercom at the lesser of market rate terms or actual cost to Intercom (in the event Intercom can obtain, or is receiving, below market pricing). Intercom will invoice the Company for equipment or services provided by any third party in advance of entering into any contract, without markup; and the Company may choose to reject the contract and instead direct Intercom to purchase the equipment or services at a lower price from a third party chosen by the Company. The Company will pay to Intercom any reasonable third party costs (without markup) incurred by Intercom in connection with its efforts so long as such costs are consistent with the Purpose. All vendors that provide recurring services, and that Intercom also uses for Intercom business outside the scope of this Agreement, will be subject to open book reporting. Any services or products that are provided or arranged by Intercom for the Company shall be paid on a direct cost pass-through basis and only to the extent costs are attributable to use by the Company (i.e., if an Intercom employee that is not a Key Person performs 40 hours of work, and for that work, Intercom pays the employee $400, then the cost paid by the Company will be $400 in addition to any other reasonable employment related costs allocated to the work performed). Intercom will leverage its existing relationships with such vendors and the Company will pay the direct costs to Intercom for payment to such vendors for their services provided to the Company only (without mark up). The Company may elect to engage Intercom to perform services, but only at market rate, and subject to the approval of all parties. Intercom will also assist in training employees of the Company to ensure that, at all times, an adequate number personnel (who shall reside in the local vicinity of the head end) are available and capable of operating, controlling, and repairing the system.

     3.2.    _No Other Capital Contributions Required_. Except as set forth in Section 3.1, no Member shall be required to contribute any additional capital to the Company, and except as set forth in the Act, no Member shall have any personal liability for any obligations of the Company.

     3.3.    _No Interest on Capital Contributions_. Except for the Risk Premium, Interest Holders shall not be paid interest on their Capital Contributions.

     3.4.    _Return of Capital Contributions_. No Member will be entitled to withdraw capital from the Company, or to receive any Distributions or allocations of Profit or Loss from the Company, except as a Distribution or allocation made pursuant to Article 4 or Exhibit A, as may apply.

     3.5.    _Form of Return of Capital_. If an Interest Holder is entitled to receive a return of a Capital Contribution, the Company may distribute cash, notes, property, or a combination thereof to the Interest Holder in return of the Capital Contribution.

     3.6.    _Capital Accounts_. A separate Capital Account shall be maintained for each Member in accordance with the Code and the Treasury Regulations, including but not limited to the rules regarding the maintenance of partners' capital accounts set forth in Treasury Regulations Section 1.704-1. Subject to the immediately preceding sentence, there will be credited to each Member's Capital Account (i) the amount of money contributed by the Member to the Company as Capital Contributions, (ii) Profit allocated to such Member, and (iii) items in the nature of income or gain that are specially allocated to the Member. There will be charged against each Member's Capital Account (a) the amount of money distributed to the Member by the Company, (b) Loss allocated to such Member, and (c) items in the

5

nature of loss and deduction that are specially allocated to such Member. To the extent a Member's Capital Account balance is greater than zero, such excess is hereinafter referred to as a "positive balance." To the extent that a Member's Capital Account balance is less than zero, said amount is hereinafter referred to as a "deficit balance." If an Interest is transferred, the transferee will succeed to the Capital Account of the transferor Member to the extent attributable to the transferred Interest.

3.7.    *Adjustment to Percentage Interests.*    Pursuant to the terms of that certain License Agreement by and between Intercom and Spanski Enterprises Incorporated ("SEI") dated January 31, 2011 (the "**License Agreement**"), SEI or an affiliate of SEI has been granted purchase warrants equaling ten percent (10%) of Intercom. Upon the closing of any transaction as a result of the exercise of the purchase warrants (each such occurrence, a "**Dilution Event**"), and in no other circumstance, the Percentage Interests of the Members will be adjusted as set forth below in this Section 3.7:

3.7.1.    Valuation of Intercom. As and when required under the License Agreement, the fair market value of Intercom will be determined based on all of the business assets then owned by Intercom, which currently are comprised of rights to distribute Albanian content, Bosnian content and Polish content. In the event that any other rights are owned by Intercom, such rights will be factored into the valuation and a specific value will be attributed to each group of assets based on the stand-alone-value of each separate group of assets as determined by an independent appraiser (each a "**Stand Alone Value**" together the "**Stand Alone Values**"). The method of valuation used to value each group of assets will be agreed to by the parties at the time. In determining the amount of income generated by each asset group, any overhead and other fixed cost that are not specifically attributable to a specific asset or asset group shall be allocated to the various asset groups according to the proportion of gross revenue generated by each asset group.

3.7.2.    Polish Stand Alone Quotient. The Stand Alone Value of the Polish television assets (the "**Polish SAQ**") shall equal the quotient of (i) the Stand Alone Value of the Polish assets divided by (ii) the Stand Alone Value of all of the assets groups. If the appraiser determines that the sum of the Stand Alone Values of all asset groups (excluding the Polish assets) is less than or equal to zero dollars, then the Polish SAQ shall equal one (1).

3.7.3.    Adjustment to DBPOL's Percentage Interest. Upon a Dilution Event, DBPOL's Percentage Interest shall be adjusted by subtracting the DBPOL Adjustment (as defined below) associated with the applicable Dilution Event from DBPOL's Percentage Interest in effect immediately prior to the Dilution Event. The remainder shall constitute DBPOL's adjusted Percentage Interest, subject to any further Dilution Events that may subsequently occur. The "**DBPOL Adjustment**" equals the product of (i) the Polish SAQ multiplied by (ii) ten percent (10%) multiplied by (iii) the DBPOL Percentage Interest. If the amount of warrants redeemed in any Dilution Event results in less than the acquisition of a ten percent interest in Intercom, then the calculations shall be adjusted accordingly for that Dilution Event.

3.7.4.    Intercom's Adjusted Percentage Interest. Simultaneously with the adjustment to DBPOL's Percentage Interest pursuant to Section 3.7.3, above, Intercom's Percentage Interest shall be adjusted by adding the DBPOL Adjustment to Intercom's Percentage Interest in effect immediately prior to the Dilution Event. The resulting amount shall constitute Intercom's adjusted Percentage Interest, subject to any further Dilution Events that may subsequently occur. Note that any adjustment to the Percentage Interests of Intercom and DBPOL pursuant to Section 3.7 shall not have any affect on the Percentage Interest of Round Grove, which in all events shall remain at 2.5%.

Example 1:

If the appraiser determines that the Stand Alone Values of the asset groups are as follows: Polish Assets: $10MM, Bosnian Assets: $0MM, Albanian Assets: $0MM, and Other Assets: $0MM, then:

- The Polish SAQ shall equal 1 [10MM / 10MM + 0 + 0 + 0 = 1]

6

- The DBPOL Adjustment shall equal 2.5% [1 x .1 x 25% = 2.5%]
- DBPOL's adjusted Percentage Interest shall equal 22.5% [25% - 2.5% = 22.5%]
- Intercom's adjusted Percentage Interest shall equal 75% [72.5% + 2.5% = 75%]
- Round Grove's Percentage Interest shall remain unchanged

Example II:

If the appraiser determines that the Stand Alone Values of the asset groups are as follows: Polish Assets: $7MM, Bosnian Assets: $1MM, Albanian Assets: $1MM, and Other Assets: $1MM, then:

- The Polish SAQ shall equal .7 [7MM / 7MM + 1MM + 1MM + 1MM = .7]
- The DBPOL Adjustment shall equal 1.75% [.7 x .1 x 25% = 1.75%]
- DBPOL's adjusted Percentage Interest shall equal 23.25% [25% - 1.75% = 23.25%]
- Intercom's adjusted Percentage Interest shall equal 74.25% [72.5% + 1.75% = 74.25%]
- Round Grove's Percentage Interest shall remain unchanged

## ARTICLE IV
### PROFIT, LOSS, AND DISTRIBUTIONS

4.1.    *Distributions.*

4.1.1.    Following repayment in full of any Member Loans, all Net Cash will be distributed in the following proportions and order of priority on a monthly basis:

(a)    First, to the extent of any unpaid Capital Contributions, 75% to DBPOL, 22.5% to Intercom, and 2.5% to Round Grove, *pari passu;*

(b)    Second, to the extent of any unpaid Risk Premium due and payable with respect to any Capital Contributions, 50% to DBPOL, 47.5% to Intercom, and 2.5% to Round Grove, *pari passu;*

(c)    Third, 50% to DBPOL, 47.5% to Intercom, and 2.5% to Round Grove, *pari passu,* until the aggregate amount distributed to each party under this Subsection 4.1.1(c) equals $225,000 to DBPOL, $213,750 to Intercom, and $11,250 to Round Grove, respectively; and

(f)    Thereafter, following the repayment in full of all Capital Contributions, any Risk Premium and the amounts required to be distributed under Subsection 4.1.1(c), the balance shall be paid to DBPOL, Intercom, and Round Grove, *pari passu,* in proportion to each party's respective Percentage Interest.

4.1.2.    *Bulk Sale of STBs and/or the Tech Assets.*  Notwithstanding the provisions of 4.1.1, to the extent the Company has not made distributions of Net Cash or proceeds from the sale of STBs sufficient to repay in full the Capital Contributions, any proceeds from a bulk sale or liquidation of the STBs and/or the Tech Assets (other than in ordinary course, such as a sale of individuals STBs to individual end users) will be distributed 100% to DBPOL. In the event Intercom acquires any of the STBs and/or the Tech Assets from the Company, Intercom shall pay a purchase price equal to their fair market value, which purchase price may be offset in whole or part against distributions of Net Cash then payable to Intercom under this Agreement. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Members. Any amounts in excess of the amount necessary to repay in full the outstanding Capital Contributions will be distributed in accordance with the distribution provisions of Section 4.1.1.

7

CONFIDENTIAL

DB0002355

4.2.    *Allocation of Profit or Loss/Tax Allocations.* After giving effect to the tax allocations set forth on <u>Exhibit A</u> for any taxable year of the Company, Profit or Loss shall be allocated to the Members in proportion to their Percentage Interests.

4.3.    *Liquidation and Dissolution.*

4.3.1.  <u>Distribution</u>. If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to Section 4.2, if any, and distributions, if any, of cash or property, pursuant to Section 4.1.

4.3.2.  <u>Negative Capital Account</u>. No Interest Holder shall be obligated to restore a Negative Capital Account.

4.4.    *General.*

4.4.1.  <u>Timing</u>. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Members.

4.4.2.  <u>Valuation</u>. If any assets of the Company are distributed in kind to the Interest Holders (as determined by the Members), those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Interest Holders so entitled. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Members. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 4.3.

4.4.3.  <u>Profit and Loss Allocation</u>. All Profit and Loss shall be allocated, and all distributions shall be made, to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit or Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to any extraordinary non-recurring items of the Company.

4.4.4.  <u>Amendment</u>. The Members are hereby authorized, upon the advice of the Company's tax counsel, to amend this Article IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent.

4.4.5.  <u>Distribution Prohibition</u>. No distributions or return of contributions shall be made and paid if, after the distribution or return of distribution is made, either:

(a) the Company would be insolvent; or

(b) the net assets of the Company would be less than zero.

The Manager may base a determination that a distribution or return of contribution may be made under Section 4.4.5(a) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

8

4.5.   *Tax Distribution.*  If for any calendar year other than the year in which the Company liquidates, the distributions otherwise distributable to the Members pursuant to Section 4.1, if any, plus any amounts previously distributed to each such Member pursuant to Section 4.1, plus any amounts previously distributed to each such Member pursuant to this Section 4.5, would be insufficient to pay any Member's federal and state income taxes on the net, combined Profits, Losses, Gain or Loss on Disposition and other items of income and deduction (as computed for tax purposes) allocated to such Members pursuant to Article IV from the inception of the Company (the "**Net Tax**"), then, to the extent the Company has sufficient cash on hand to do so (with this Section 4.5 being applied before the other distribution provisions of this Agreement and amounts distributed to a Distribution Member (defined below) to be treated as distributions to such Member under Section 4.1 and reduce subsequent amounts distributable to such Member under Section 4.1), the Company shall distribute to such Members (each a "**Distribution Member**"), upon their written request, on or about April 15 of the following year, the amount of cash needed to pay such Net Tax (the "**Tax Distribution**") after taking into consideration the amounts previously distributed pursuant to Section 4.1 and the amounts previously distributed pursuant to this Section 4.5. If more than one Member requests such a Tax Distribution with respect to any calendar year and there is insufficient cash on hand to distribute the full amounts as computed above, then the cash on hand shall be distributed to the Members in proportion to the amounts as computed above.  For purposes of this Section 4.5, a Member's federal and state income tax liability shall be computed by using the maximum tax rate (reduced to reflect the maximum federal tax benefit from the deduction of state income taxes).  Tax Distributions shall be limited to the cash of the Company and the Company shall not borrow money, sell assets or make calls for Capital Contributions to make such cash distributions. For purposes of applying this Section 4.5 and determining the federal and state taxes and tax liability of a Member that is a partnership, limited liability company or S corporation (a "pass-through Entity), the applicable rates shall be the maximum tax rate for federal and state reduced to reflect the maximum federal tax benefit from the deduction of state income taxes and shall be deemed to apply to the Pass-through Entity.

4.6.   *Repayment of Capital Contributions.*  DBPOL and Intercom comprise all of the indirect owners of Katalyst Ventures, LLC as set forth in the Katalyst Ventures LLC operating agreement entered into by and between Bahama Kat, LLC, an Illinois limited liability company, and Intercom, dated as of November 25, 2009 (the "**Katalyst Agreement**").  In the event, and for so long as, (i) any unpaid Capital Contributions remain outstanding, and (ii) the Company is not expected to generate any additional distributable Net Cash or additional proceeds from the sale of STBs, then Intercom agrees that (x) DBPOL will be entitled to receive 90% of any aggregate distributions made pursuant to the Katalyst Agreement but only to the extent of any unreturned Capital Contributions, and (y) notwithstanding anything contained herein to the contrary, DBPOL will have exclusive control and make all decisions regarding the Company without any vote by Intercom during such period.  In the event that an Affiliate of Intercom becomes a Member of this Company, then Intercom will execute the necessary documentation to memorialize this right of DBPOL.  In no event will the rights outlined above in this Section 4.6 give DBPOL, or any Affiliate of DBPOL, the right to foreclose or acquire the membership interest of Intercom in Katalyst Ventures, LLC.  The parties hereto agree to execute any and all documents (including an amendment to the Katalyst Agreement) to memorialize the rights under this Section 4.6.

4.7.   *Dilution Event Payment.*  Upon the occurrence of any Dilution Event, Intercom shall pay to DBPOL an amount (the "**Dilution Event Payment**") equal to the product of (a) the Polish SAQ, multiplied by (b) twenty-five percent (25%), multiplied by (c) the Total Warrant Payment, where the Total Warrant Payment is the aggregate amount of consideration paid to Intercom pursuant to a Dilution Event.

Example:

Assuming that the total amount paid in connection with the exercise of the warrants is $1MM, and the Polish SAQ is .5, then the Dilution Event Payment would be $125,000.

9

## ARTICLE V
## MANAGEMENT: RIGHTS, POWERS, AND DUTIES

5.1.   *Management.*

5.1.1.   <u>Manager</u>. The Company shall be initially managed by the Manager. The Members hereby designate DBPOL as the initial Manager of the Company from the date hereof until the repayment in full of the Capital Contributions and the Risk Premium owed under this Agreement. From and after said date, the Manager shall consist of a committee (the "**Management Committee**") comprised of four individuals, one (1) of whom shall be designated by DBPOL and three (3) of whom shall be designated by Intercom. The Management Committee may act only with the consent of a minimum of three (3) members. Except as otherwise provided in this Agreement, the Manager or the Management Committee will have discretion in the management and control of the business and affairs of the Company as reasonably necessary to achieve the Purpose and subject to the availability of funds.

5.1.2.   <u>Authority/Implementation</u>. Except as otherwise provided herein, any action taken by the Manager or the Management Committee in accordance with the terms of this Agreement will constitute the act of and serve to bind the Company. The Manager or the Management Committee will have the authority to make all expenditures that constitute Approved Expenses and engage in any acts and transactions on behalf of the Company that are consistent with the Purpose. The Manager or the Management Committee will implement all Major Decisions pursuant to the parameters approved by the Members. The Manager or the Management Committee will not employ, or permit any other Person to employ any funds or assets of the Company in any manner other than for the exclusive benefit of the Company. Except as otherwise expressly provided in this Agreement, the Company will not pay fees to the Manager or any Member, including members of the Management Committee, as consideration for the performance of their duties as such; except that the Company will reimburse the Manager, or any member of the Management Committee, for the reasonable third party direct costs incurred by the Manager (and its Affiliates, employees or agents) or any member of the Management Committee, on behalf of the Company to the extent such costs are reasonably necessary to achieve the Purpose and do not exceed market rate.

5.1.3.   <u>Major Decisions</u>. Notwithstanding anything in this Agreement to the contrary, the actions or decisions by or on behalf of the Company that are designated on <u>Exhibit B</u> are "**Major Decisions**" will require the prior written approval of both Intercom and DBPOL. The Manager or the Management Committee will provide written notice to the Members of any Major Decisions.

5.1.4.   <u>Engagements by the Company; Enforcement of Affiliate Agreements</u>. The Manager or the Management Committee may engage, on behalf and at the expense of the Company, such persons as the Manager or the Management Committee in its reasonable judgment will deem advisable for the conduct and operation of the business of the Company, including engineers, consultants, contractors and purveyors of other services or materials for the Company on such terms and for such compensation as the Manager or the Management Committee, in its reasonable discretion, will determine. Notwithstanding any other provision of this Agreement, no Member will have any right to act on behalf of the Company, nor will the approval or consent of any Member be required, in connection with the enforcement on behalf of the Company of any agreements between the Company and such Member or any Affiliate of such Member, or the settlement waiver, compromise or release on behalf of the Company of any claims between the Company and such Member or any Affiliate of such Member; the authority to act on behalf of the Company in connection with the enforcement of any such agreements or any such settlements, waiver, compromises being reserved exclusively to the other non-Affiliated Member.

5.2.   *Meetings of and Voting by Members.*

10

DB0002358

5.2.1. Meeting. A meeting of the Members may be called at any time by any Member, however, Members will not be required to hold any annual or other meetings, except as expressly required by other provisions of this Agreement or by applicable law. Meetings of Members shall be held (i) at the Company's principal place of business (ii) at any other location designated by the Manager or the Management Committee, or (iii) electronically (by video-conference or by telephone or any other means that allows all participants to communicate with each other). Not less than ten (10) nor more than ninety (90) days before each meeting, the Member calling the meeting shall give written notice of the meeting to each Member. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than fifty-one percent (51%) of the Voting Percentage Interests then held by Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney in fact.

5.2.2. Voting.

(a) The Company may act (other than actions or decisions which are vested in the Manager or the Management Committee) only upon the consent of Member(s) holding not less than 51% of the Voting Percentage Interests.

(b) Notwithstanding anything to the contrary contained herein, both before and after the Shift Date, Intercom shall determine and control the method and manner of providing services and equipment in connection with providing IPTV to meet the obligations of the Company, as reasonably necessary to achieve the Purpose.

5.2.3. Written Consent. In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members as consistent with the provisions of this Agreement.

5.3.   Services. To the extent that any employees of any Member (other than Key Persons, defined below) are required to dedicate a material portion of their efforts to work exclusively on behalf of the Company and such efforts are reasonably necessary to achieve the Purpose, such personnel will be reimbursed by the Company as determined by Manager or the Management Committee, provided that such compensation shall not exceed that which is normally paid for similar employees in the industry performing similar work. Except as set forth in the preceding sentence or as otherwise approved by both Members, no Member shall be entitled to compensation for services performed for the Company.

5.4.   Duties of Parties/Key Persons.

5.4.1. Devotion of Time. Each Member shall devote such time to the business and affairs of the Company as is necessary to carry out the Member's duties set forth in this Agreement.

5.4.2. Key Persons. Dylan Bates, Valton Hoti, and Drilon Qehaja are each deemed a "Key Person" and shall devote appropriate amounts of time as necessary to accomplish the needs of the Company, properly conduct the affairs of the Company and achieve the Purpose of the Company. The Compensation of Key Persons is a Major Decision and will be decided accordingly.

5.4.3. Internal Transactions. Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

5.5.   Liability and Indemnification.

11

CONFIDENTIAL

5.5.1. <u>Liability</u>. A Member shall not be liable, responsible, or accountable, in damages or otherwise, to any other Member or to the Company for any act performed by the Member with respect to Company matters, except for fraud, gross negligence, willful misconduct or an intentional breach of this Agreement.

5.5.2. <u>Member Indemnification</u>. The Company shall indemnify each Member for any act performed by the Member with respect to Company matters, as and to the full extent permitted by Act Section 18-108, but in no event for fraud, gross negligence, or an intentional breach of this Agreement.

5.5.3. <u>Party Indemnification</u>. Intercom will protect and defend DBPOL, Round Grove, and the Company from and against any and all claims, of any kind or description, on account of the use by the Company of software (proprietary or general), licensing of software, hardware, programming and IPTV content furnished by Intercom.

5.6.    *Removal, Resignation and Replacement of Manager*. The Members will have the right to remove any Manager or member of the Management Committee in the event (i) the Manager or a member of the Management Committee engages in fraud, gross negligence, willful misconduct or an intentional breach of this Agreement, (ii) of an Involuntary Withdrawal with respect to a Managing Member or a Member who is a member of the Management Committee, or (iii) of a Voluntary Withdrawal by a Managing Member or a Member who is a member of the Management Committee. Except as specifically provided in this Agreement, the removal of a Member as Manager or as a member of the Management Committee will have no effect upon such Member's Interest in the Company. Neither DBPOL nor Intercom may resign as Manager or member of the Management Committee at any time, without the prior written consent of the other party. In the event DBPOL is removed as Manager or from the Management Committee under the circumstances described in this Section 5.6, Intercom, or an Affiliate of Intercom designated by Intercom, will automatically become the Manager or fill the vacancy on the Management Committee; and DBPOL will have no further rights to approve Major Decisions, all such rights thereafter being thereafter vested solely in Intercom. In the event Intercom or one of its designees are removed from the Management Committee under the circumstances described in this Section 5.6, DBPOL, or an Affiliate of DBPOL designated by DBPOL, will automatically become the Manager and, if applicable, the Management Committee will be dissolved; and Intercom will have no further rights to approve Major Decisions, all such rights thereafter being thereafter vested solely in DBPOL. If DBPOL and Intercom, or one of Intercom's designees to the Management Committee, are both removed for reasons set forth in this Section 5.6, the Members shall elect an independent third-party to be the Manager of the Company.

## ARTICLE VI
### TRANSFER OF INTERESTS AND WITHDRAWALS OF MEMBERS

6.1.    *Transfers*. Any Member may Transfer all, or any portion of, or any direct or indirect interest or rights in, the Membership Rights (any such Transfer, an "**Interest Transfer**") owned by such Member without the prior written consent of any other Member, provided that (a) neither DBPOL nor Round Grove may Transfer any portion of its Membership Rights to any entity that constitutes (or is related or affiliated with) a competitor of Intercom, without the prior written consent of Intercom which may be withheld in Intercom's sole and absolute discretion for any reason (or no reason), (b) any such Transfer to a party that is not an Affiliate of the transferring Member shall be subject to the right of first refusal as described below in Section 6.5, and (c) any such Transfer by Intercom to a party that is not an Affiliate of Intercom shall be subject to the 'tag-along' rights as described below in Section 6.6. Each Member hereby acknowledges the reasonableness of this provision in view of the purposes of the Company and the relationship of the Members. The Transfer of any Membership Rights or Interests in violation of the conditions and requirements set forth in Article VI shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Membership Rights are attempted to be transferred in

12

CONFIDENTIAL

DB0002360

violation of the provisions of this Article VI shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, to the maximum extent permitted by law, receive distributions from the Company, or have any other rights in or with respect to the Membership Rights. The definition of "Interest Transfer" shall include (x) any Transfer of any direct or indirect ownership interest in, or a sale of substantially all of the assets of, any entity that owns a direct or indirect interest in the Company, which includes, but is not limited to, those interests that are more than one level removed from the entities that are direct Members of the Company, and (y) any merger or consolidation to which any entity that owns a direct or indirect ownership interest in the Company is a party. Any such Interest Transfer that satisfies either of the conditions set forth in immediately preceding subparagraph (x) or (y) is sometimes referred to herein as an "**Indirect Interest Transfer**". In the event of any proposed Indirect Interest Transfer in which any portion of the consideration attributable to the Indirect Interest Transfer relates to assets or entities in addition to those assets owned by the Company, the transferring party must fairly and reasonably allocate the total purchase price across all such constituent entities or assets that are the subject of the transaction and, in addition, provide supporting and backup information and calculations regarding the proposed allocation (as more fully described below).

6.2. *Voluntary Withdrawal.* No Member shall have the right or power to effect a Voluntary Withdrawal from the Company. Any Member who effectuates a Voluntary Withdrawal in violation of this Agreement shall not be entitled to receive the fair value of the Member's Interest as of the date of the Voluntary Withdrawal as otherwise provided in Section 18-604 of the Act.

6.3. *Involuntary Withdrawal.* Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the Withdrawn Member shall thereupon become an Interest Holder but shall not become a Member. If the Company is continued as provided in Section 7.1, the successor Interest Holder shall not be admitted as a Member or have any voting or management rights with respect to the Company, and the successor Interest Holder will have the rights to receive distributions with respect to the Interest, however, neither the predecessor nor the successor Interest Holder shall be entitled to receive in liquidation of the Interest, pursuant to the Act, the fair market value of the Member's Interest as of the date the Member involuntarily withdrew from the Company.

6.4. *Transferee Capital Account.* If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

6.5. *Right of First Refusal.*

6.5.1. If a Member (individually, a "**Transferor**") desires to transfer to other Person (a "**Transferee**") all or any portion of or any interest or rights in the Transferor's Membership Rights (the "**ROFR Interest**") then, prior to any Transfer of the ROFR Interest, the Transferor shall give the Company written notice (the "**Transfer Notice**") containing each of the following:

    (a)    the Transferee's identity;

    (b)    a true and complete copy of the Transferee Offer; and

    (c)    a description of the terms of the transfer (the "**Offer**").

6.5.2. The Offer shall be and remain irrevocable for a period (the "**Offer Period**") ending at 11:59 P.M. local time at the Company's principal office, on the fifteenth (15th) day following the date the Transfer Notice is given to the Remaining Members. At any time during the Offer Period, a Remaining Member may accept the offer by notifying the Transferor in writing that the Remaining Member intends to purchase all, but not less than all, of the ROFR Interest. If two (2) or more

13

DB0002361

Remaining Members desire to purchase the ROFR Interest pursuant to the Offer, then, in the absence of an agreement between or among them, each such Remaining Member shall purchase the ROFR Interest in the proportion that his respective Percentage bears to the total Percentage Interests of all of the Remaining Members who desire to accept the Offer.

6.5.3.  If any Remaining Member accepts the Offer, the purchase price for the ROFR Interest shall be paid in immediately available funds on the Transfer Closing Date in accordance with the payment terms set forth in the Offer.

6.5.4.  If no Remaining Member accepts the Offer (within the time and in the manner specified in this Section), then the Transferor shall be free for a period (the "**Free Transfer Period**") of fifteen (15) days after the expiration of the Offer Period to Transfer the ROFR Interest to the Transferee, for the same or greater price and on the same terms and conditions as set forth in the Transfer Notice.

6.5.5.  Any Transfer by the Transferor after the last day of the Free Transfer Period or without strict compliance with the terms, provisions, and conditions of this Section and the other terms, provisions, and conditions of this Agreement, shall be null and void and of no force or effect.

6.6.  *Tag-Along Right.*

6.6.1.  If any of Intercom, Valton Hoti, or Drilon Qehaja desires to make any Interest Transfer to a third party, Intercom shall promptly give written notice (the "**Intercom Transfer Notice**") to the other Members.  Such notice shall describe in reasonable detail the proposed Transfer, including, without limitation, the nature of such Transfer, the consideration to be paid (which cannot include present or future services), the name and address of each prospective purchaser or transferee, as well as the information described in Section 6.5.1, above (as applicable).  If any portion of the purchase price or valuation is attributable to non-Company assets, then Intercom shall provide the following additional information:  (i) the gross purchase price paid for all interests or assets; (ii) a breakdown and allocation of the gross purchase price across all constituent entities or assets, including a statement of the allocable portion of the gross purchase price attributable to the Company; and (iii) the method of determining such allocation and valuation for the Transferred Interests (the information described in this subparagraphs (i) through (iii) is collectively referred to as the "**Indirect Transfer Information**").

6.6.2.  Each other Member shall have the right, exercisable upon written notice (an "**Exercise Notice**") to Intercom within fifteen (15) calendar days after receipt of the Intercom Transfer Notice, to participate, on the same terms and conditions set forth in the Intercom Transfer Notice (based on a per share price), in such Transfer and to Transfer to the prospective purchaser or transferee all of the Membership Rights then held by the electing Member(s).  To the extent either DBPOL or Round Grove exercises such right of participation, the proposed Transfer may only occur if the third party agrees to acquire all of the Membership Rights of the electing Member(s) on the same terms and conditions as set forth in the Transfer Notice (as may be amended with the consent of Intercom and the electing Member(s)).  It will be a condition precedent to any proposed transfer by Intercom, Valton Hoti, or Drilon Qehaja that Intercom, Valton Hoti, or Drilon Qehaja comply with the requirements and obligations of this Section 6.6.

6.6.3.  In the event an Exercise Notice is not given to Intercom pursuant to this Section within fifteen (15) calendar days after receipt of the Transfer Notice, Intercom shall have a period of thirty (30) calendar days thereafter in which to Transfer the applicable Interests subject to the Transfer Notice upon terms and conditions (including the purchase price) no more favorable to the third party than those specified in the Transfer Notice.  In the event Intercom, Valton Hoti, or Drilon Qehaja does not Transfer the applicable Interests subject to the Transfer Notice within the specified thirty (30) calendar day period, no Transfer of such Interests may be made without first again complying with the provisions of this Section.

14

6.6.4.  With respect to an Indirect Interest Transfer in which any portion of the purchase price or valuation is attributable to non-Company assets, the Members shall in good faith attempt to agree upon what portion of the negotiated gross purchase price should be reasonably allocated and attributed to the Company (as compared to the other non-Company assets that may be included in the transaction).  For purposes of clarification, this Section 6.6.4 shall only apply to the <u>allocation</u> of the gross purchase price to the Interests for purposes of determining the relevant valuations described in Section 6.6.  If the Members are not able to so agree within ten (10) days after receipt of the information required to be delivered hereunder, then each Member shall, within five (5) business days after the expiration of such ten (10) day period, specify by written notice to the other Members the name and address of an Appraiser to act on behalf of such Member.  If a Member fails to appoint its Appraiser within such ten (10) business day time period, then the Appraiser appointed by the other Member shall carry out the appraisal hereunder.

6.6.5.  Within twenty (20) days after the appointment of the Appraiser or Appraisers pursuant to Section 6.6.4, each such Appraiser shall render an opinion in writing setting forth the net fair market value of the Company or the property of the Company (as may apply), based on a reasonable and appropriate allocation of the total consideration offered for the interests that are the subject of the applicable Indirect Transfer, and deliver the same to each Member.  The allocation of value shall be determined and made in accordance with sound, customary and usual appraisal practices for the appraisal of similarly situated companies, taking into account the standards specified herein.  The Appraisers shall have the right, but shall not be obligated, to consult the Members, the Manager or the Management Committee, the accountants, experts and competent authorities, and receive factual information or evidence pertaining to a determination of the net fair market value of the Company; as necessary, the net fair market value of the other non-Company assets that are the subject of the proposed transaction; and the proper allocation of the gross purchase price offered in connection with the Indirect Transfer, as the Appraisers may consider necessary or useful.  The member that may exercise its tag along rights shall not be required to accept, and shall not be bound by, any purchase price allocation that may have been agreed upon by the parties to the Indirect Transfer.  The determination of each Appraiser shall contain appropriate supporting detail and explanation.  Such determinations shall be binding and conclusive upon the Members, absent fraud or manifest error.  If the determinations of the proper allocation by the two Appraisers are within five percent (5%) of each other, then the proper allocation of purchase price shall be the arithmetic average of the two appraisals.  If the determinations of the proper allocation by the two Appraisers are not within five percent (5%) of each other, then, within ten (10) business days, the two Appraisers shall appoint a third Appraiser, who will determine which of the two allocations more closely reflects the Third Appraiser's determination of fair market value of the applicable Interests.  The third Appraiser shall notify the Members simultaneously of the final determined fair market value and purchase price allocation within three (3) business days after making such determination.  In no event will the Members be obligated to accept the allocation that is determined pursuant to this Section 6.6.5, however, their only remedy will be to not exercise their Tag-Along rights with respect to the applicable transaction.

6.8.    Remedies.  The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or in equity.

15

## ARTICLE VII
### DISSOLUTION, LIQUIDATION, AND TERMINATION OF THE COMPANY

7.1.     *Events of Dissolution.* The Company shall be dissolved upon the (i) unanimous written agreement of the Members; or (ii) occurrence of an Involuntary Withdrawal, if within ninety (90) days after the occurrence of the Involuntary Withdrawal there are not at least two (2) remaining Members, or all the remaining Members elect not to continue the business of the Company pursuant to the terms of this Agreement.

7.2.     *Procedure for Winding Up and Dissolution.* If the Company is dissolved, the remaining Members shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company; second, to DBPOL to the extent of any unpaid Prior Capital Investment amount; then, to the Interest Holders in accordance with Section 4.1.

7.3.     *Filing of Certificate of Dissolution.* If the Company is dissolved, the Members shall promptly file a Certificate of Dissolution with the Secretary. If there are no remaining Members, the Certificate of Dissolution shall be filed by the last Person to be a Member; if there are no remaining Members, or a Person who last was a Member, the Certificate of Dissolution shall be filed by the legal or personal representatives of the Person who last was a Member.

## ARTICLE VIII
### BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS

8.1.     *Bank Accounts.* All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name. The Manager shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein, provided that all accounts shall be maintained in the State of Illinois unless the all parties to this agreement approve otherwise.

8.2.     *Books and Records.* The Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The books and records shall be maintained in accordance with sound accounting principles and practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

8.3.     *Annual Accounting Period.* The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Members, subject to the requirements and limitations of the Code.

8.4.     *Reports.* Within one hundred twenty (120) days after the end of each taxable year of the Company, the Members shall cause to be sent to each Person who was a Member at any time during the taxable year then ended a complete accounting of the affairs of the Company for the taxable year then ended. In addition, within one hundred twenty (120) days after the end of each taxable year of the Company, the Members shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, the tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year. Furthermore, the Members shall cause a copy of the Company's federal, state, and local income tax returns to be delivered to each Member promptly after such returns become available. At the request of any Member, and at the requesting Member's expense, the Members shall cause an audit of the Company's books and records to be prepared by independent accountants for the period requested by the Member.

16

CONFIDENTIAL

8.5.    *Title to Company Property.*  A Member's Interest will be personal property for all purposes.  All property owned by the Company, whether real or personal, tangible or intangible, will be deemed to be owned by the Company as an entity and no Member individually will have any ownership of such Company property.

8.6.    *Tax Matters Member.*  The Manager shall designate a Member to be the "tax matters member" of the Company pursuant to Section 6231 of the Internal Revenue Code. Any Member who is designated "tax matters member" shall take such action as may be necessary to cause each other Member to become a "notice member" within the meaning of Section 6223 of the Internal Revenue Code. Any Member who is designated "tax matters member" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters member" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity.  Any Member who is designated "tax matters member" may not take action contemplated by Section 6222 through 6232 of the Internal Revenue Code without the consent of the Manager, but this sentence does not authorize such Manager to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Internal Revenue Code. The Members agree to cooperate with each other and the Manager and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

**ARTICLE IX:**
**EXCLUSIVE; NON-COMPETE**

9.1.  Notwithstanding anything contained herein to the contrary, each Member agrees not to undertake any of the following, except through the Company (or a related entity formed by the Members or their Affiliates):

9.1.1.  distribute or sell content to any end users (commercial or residential) for any Poland-based media content or related content regardless of location or market;

9.1.2.  engage in any business that competes with the Company's activities in such areas as are agreed upon by the parties;

9.1.3.  sell or distribute STBs to any other business that competes with the Company; or

9.1.4.  acquire, develop, produce, or procure any content that would compete with programming distributed by the Company (or such other types of content as may be agreed to by the parties), including soliciting Poland-based content producers to distribute or transmit their content through any media.

The Members acknowledge that any content or programming originating or created by or through the Company may only be distributed through the Company unless both parties agree, and that the Members are prohibited from distributing any such content or programming through any other networks, distribution channels, or systems outside those owned 100% by the Company without the consent of both Members.

9.2.    *Confidential and Proprietary Information.*  In connection with this Agreement, either party (the "**Disclosing Party**") has provided or may provide the other party (the "**Recipient**") with certain information, data and/or documentation, (subject to the exclusion, below, "**Confidential Information**") which is of value to the disclosing party, is not generally known in the industry or to competitors of that party, and is identified as confidential at the time of disclosure. Confidential Information includes:  (i) the identity of any vendor used (or to be used) by Intercom and any information related thereto; (ii) the technology provided by Intercom, including hardware, software and service; (iii) any current or future customer data or information related to, and any customer information retained by, or stored by, any

17

CONFIDENTIAL

DB0002365

database or platform or any yet to be created database or platform associated with the Company; and (iv) any contracts or agreements and the terms thereof between the Members, the Company and/or other parties. Notwithstanding the foregoing, Confidential Information shall not include information which: (x) is unrelated to the disclosing party's business and becomes generally available to the public other than as a result of a disclosure by the recipient; or (y) is, or becomes, available to the recipient on a non-confidential basis from a source other than the disclosing party, provided that such source is not bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information. Confidential Information shall remain the property of the disclosing party, and the recipient shall not disclose or make available any Confidential Information of the disclosing party, whether orally or in writing or in any other way, to any other person without the prior written permission of the disclosing party, except no consent is required for disclosure in connection with the execution of the Purpose. The recipient shall take every reasonable precaution to avoid disclosing such Confidential Information, and such precautions shall include, but are not limited to, the safeguarding of documents, the making of copies only when necessary, and following security instructions issued by the disclosing party to the recipient from time to time. The recipient shall, on the disclosing party's request upon expiration or termination of this instrument, return all documentary or other records of such Confidential Information and all copies thereof, except as may be necessary for the recipient's accounting, tax, legal or regulatory requirements. The recipient's duty of non-disclosure shall survive any expiration or termination of this instrument. The terms and conditions of this Agreement are deemed to be Confidential Information of the parties.

9.3.  *Standard of Care.* In furtherance, and not in limitation of the foregoing Section 9.2, each Member agrees to do the following with respect to any such Confidential Information: (i) exercise the same degree of care to safeguard the confidentiality of, and prevent the unauthorized use of, such information as that Member exercises to safeguard the confidentiality of its own Confidential Information; and (ii) instruct and require such advisors, employees, sub-licensees and agents to maintain the confidentiality of such information and not to use such confidential information except as expressly permitted herein.

9.4  *Non-Competition with Business Purpose.* Each party agrees that it shall not compete, directly or indirectly with the Company or with its business purpose of the distribution of Poland-based media content or related content to commercial and residential customers. This restriction will run to each party, and its members, managers, officers, agents, and Affiliates, and shall be enforceable by both injunctive relief and any other available remedy. All remuneration, refunds or credits associated with, or deriving from, the Company shall be the sole property of the Company. No party may receive any amounts directly or indirectly associated with, or derived from, the Company except as expressly provided for in the Agreement. No party shall have any direct or indirect financial or ownership interest in any vendor that is engaged by the Company. Any such interests must be disclosed to the other party as soon as possible during the process of identifying possible vendors. However, nothing contained herein will prevent any party from engaging in any business that is not related to the Intercom Protected Business (as defined below), or any business in which the parties may be respectively or previously engaged as of the execution of this Agreement.

9.5.  *Non-Competition with Intercom.* DBPOL, its members, managers, officers, and Affiliates understand and acknowledge that Intercom is in the business of distributing program content through IPTV as well as supplying equipment and services for the distribution of customer program content through IPTV (the "**Intercom Protected Business**"). DBPOL, its members, managers, officers, and Affiliates agree that they shall not directly or indirectly, either for their own account, as a member, manager, officer, partner, or employee, of or for any person, firm, association, limited liability company, or corporation, or as an officer, director, or stockholder of a closely held corporation, engage in any or all of the following activities (except through the Company and to the extent reasonably necessary to achieve the Purpose):

18

9.5.1.  Enter into or engage in any business which competes with the Intercom Protected Business;

9.5.2.  Solicit customers, business, patronage or orders for or sell any parts and products for himself or for any person, firm, association or corporation engaged in a business which competes with the Intercom Protected Business or supervise sales agents or representatives engaged in a business which competes with the Intercom Protected Business;

9.5.3.  Enter into or engage in any discussion or negotiation, or assist in actions to encourage employees, agents, or independent contractors of Intercom to end their relationship with the Intercom in order to engage in any business which competes with the Intercom Protected Business;

9.5.4.  Promote or assist, financially or otherwise, any person, firm, association or corporation in a manner that competes with the Intercom Protected Business.

These restrictions shall be enforceable by both injunctive relief and any other available remedy

## ARTICLE X
## GENERAL PROVISIONS

10.1.  *Assurances.* Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Members deem appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

10.2.  *Notifications.* Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, a "notice") required or permitted under this Agreement must be in writing and delivered (i) personally, (ii) sent by certified or registered mail, postage prepaid, return receipt requested, or (iii) by electronic mail or facsimile, provided there is proof of transmission thereof. Notice information for the parties is set forth below:

If to INTERCOM:

Intercom Ventures, LLC
1165 North Clark St. suite 314
Chicago, IL 60610

If to DBPOL:

790 Remington Blvd.
Bolingbrook, IL 60440
Fax:  (630) 759-6702
Email:  dylan.bates@atipt.com

If to ROUND GROVE LLC:

Attn: Jerry Weller
285 Cordova Rd,
West Palm Beach, Florida  33401  USA

A copy of any notice sent to any party shall also be sent to counsel for the Company:

Daniel C. Cole  C.P.A., J.D.
HANDLER THAYER, LLP

19

CONFIDENTIAL

DB0002367

191 N. Wacker Drive, 23rd Floor
Chicago, Illinois 60606-1633
Fax: 312.641.6866

Email: dcole@handlerthayer.com

A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. A notice sent by email or facsimile will be deemed given on the day of transmission, except that any notice sent by electronic mail or facsimile after 5 pm (Chicago time) on a business day shall be deemed to have been delivered on the next succeeding business day. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

      10.3.   *Specific Performance*. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

      10.4.   *Complete Agreement*. This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

      10.5.   *Applicable Law*. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Illinois.

      10.6.   *Section Titles*. The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

      10.7.   *Binding Provisions*. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

      10.8.   *Jurisdiction and Venue*. Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the Northern District of Illinois or any Illinois State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

      10.9.   *Terms*. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

      10.10.   *Separability of Provisions*. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

      10.11.   *Counterparts*. This Agreement may be executed simultaneously in two or more counterparts each of which shall be deemed an original, and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

20

CONFIDENTIAL

DB0002368

10.12. *Good Faith Dealings*. Neither party to this Agreement shall commit any act or take any action that frustrates or hampers the rights of the other party under this Agreement. Each party shall act in good faith and engage in fair dealing when taking any action under or related to this Agreement.

**[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]**

21

CONFIDENTIAL

DB0002369

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed as of the date set forth hereinabove.

INTERCOM VENTURES POLAND, LLC, an Illinois limited liability company

By:    Valton Hoti
Its:    MEMBER

DBPOL LLC, an Illinois limited liability company

By:    Dylan Bates
Its:    Sole Member

ROUND GROVE, LLC, an Illinois limited liability company

By:
Its:

The undersigned hereby execute this Agreement solely to bind themselves to the obligations set forth under Section 6.6 hereof.

Valton Hoti

Drilon Qehaja

22

CONFIDENTIAL

DB0002370

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed as of the date set forth hereinabove.

INTERCOM VENTURES POLAND, LLC, an Illinois limited liability company

DBPOL LLC, an Illinois limited liability company

By:   Valton Hoti
Its: _____

By:   Dylan Bates
Its:   Sole Member

ROUND GROVE, LLC, a Delaware limited liability company

By:   Gerald C Weller
Its:   Sole Member

The undersigned hereby execute this Agreement solely to bind themselves to the obligations set forth under Section 6.6 hereof.

_____
Valton Hoti

_____
Drilon Qchaja

22

CONFIDENTIAL

DB0002371

# EXHIBIT A

## TAX ALLOCATIONS

Notwithstanding Section 4.2 hereof:

(a) No allocations of loss, deduction and/or expenditures described in Code Section 705(a)(2)(B) shall be charged to the Capital Account of any Member or Interest Holder if such allocation would cause such Member or Interest Holder to have a Deficit Capital Account. The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused a Member or Interest Holder to have a Deficit Capital Account shall instead be charged to the Capital Account of any Members which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Member exists, then to the Member in accordance with their interests in Company profits pursuant to Section 4.2.

(b) In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5), (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this paragraph(b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1 (b)(2)(ii)(d) of the Treasury Regulations.

(c) In the event any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that such Member is obligated to restore to the Company under Treasury Regulations Section 1.704-1(b)(2)(ii)(c) and such Member's share of minimum gain as defined in Section 1.704-2(g)(1) of the Treasury Regulations (which is also treated as an obligation to restore in accordance with Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations), the Capital Account of such Member shall be specially credited with items of Membership income (including gross income) and gain in the amount of such excess as quickly as possible.

(d) Notwithstanding any other provision of the Agreement, if there is a net decrease in the Company's minimum gain as defined in Treasury Regulation Section 1.704-2(d) during a taxable year of the Company, then, the Capital Account of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Section paragraph (d) is intended to comply with the minimum gain chargeback requirement of Section 1.704-2 of the Treasury Regulations and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the Company's minimum gain, and the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Manager may in its discretion (and shall, if requested to do so by a Member) seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Treasury Regulation Section 1.704-2(t)(4).

(e) Items of Company loss, deduction and expenditures described in Code Section 705(a)(2)(B) which are attributable to any nonrecourse debt of the Company and are characterized as partner (Member) nonrecourse deductions under Section 1.704-2(i) of the Treasury Regulations shall be allocated to the Members' Capital Accounts in accordance with Section 1.704-2(i) of the Treasury Regulations.

23

CONFIDENTIAL

(f) Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company profit or loss for such period.

(g) In accordance with Code Section 704(c)(1)(A) and Section 1.704-1(b)(2)(i)(iv) of the Treasury Regulations, if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of contribution.

(h) Pursuant to Code Section 704(c)(I)(B), if any contributed property is distributed by the Company other than to the contributing Member within seven (7) years of being contributed, then, except as provided in Code Section 704(c)(2), the contributing Member shall be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under Code Section 704(c)(1)(A) if the property had been sold at its fair market value at the time of the distribution.

(i) In the case of any distribution by the Company to a Member, such Member shall be treated as recognizing gain in an amount equal to the lesser of:

(1) the excess (if any) of (A) the fair market value of the property (other than money) received in the distribution over (B) the adjusted basis of such Member's Membership Interest in the Company immediately before the distribution reduced (but not below zero) by the amount of money received in the distribution, or

(2) the Net Pre-contribution Gain (as defined in Code Section 737(b) of the Member. The Net Pre-contribution Gain means the net gain (if any) which would have been recognized by the distributee Member under Code Section 704(c)(1)(B) of all property which (1) had been contributed to the Company within seven years of the distribution, and (2) is held by the Company immediately before the distribution, if such property had been distributed by the Company to another Member. If any portion of the Property distributed consists of property which had been contributed by the distributee Member to the Company, then such property shall not be taken into account under this Section 9.02(i) and shall not be taken into account in determining the amount of the Net Pre-contribution Gain. If the property distributed consists of an interest in an entity, the preceding sentence shall not apply to the extent that the value of such interest is attributable to the property contributed to such entity after such interest had been contributed to the Company.

(j) In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing Member as consideration for an Economic Interest or Membership Interest, or in connection with the liquidation of the Company or a distribution of money or other property (other than a de minimis amount) by the Company to a retiring Member (as consideration for an Economic Interest or Membership Interest), the Capital Accounts of the Members shall be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f). If, under Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, depletion, amortization and gain or loss with respect to such property shall be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and its book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Members'

24

DB0002373

share of tax items under code Section 704( c).

       (k) All recapture of income tax deductions resulting from the sale or disposition of Company property shall be allocated to the Member or Members to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated any gain from the sale or other disposition of such property.

       (l) Any credit or charge to the Capital Accounts of the Members pursuant to paragraphs (b), (c) and/or (d), hereof shall be taken into account in computing subsequent allocations of profits and losses pursuant to Section 4.2, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 4.2 and this Exhibit A shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of Article IV if the special allocations required by paragraphs (b), (c) and/or (d) of this Exhibit A had not occurred.

CONFIDENTIAL

DB0002374

# EXHIBIT B
## LIST OF MAJOR DECISIONS

i.     The Company entering into any agreement to provide equipment and services for IPTV, but only to the extent such agreement is with an Affiliate of a Member (in which case, the other Members' consent is required).

ii.    The Company paying or agreeing to pay any of its Managers (other than Members) or employees or agents any salary, wages, expenses or other compensation or reimbursement, but only to the extent such salary, wages, expenses or other compensation or reimbursement is not (a) reasonable and customary, (b) on market terms, or (b) to any person that is related to a constituent member, partner or interest holder of any Member (in which case, the other Members' consent is required).

iii.   The Company hiring any employee with an aggregate compensation package in excess of $100,000 per year (including salary, bonus, and any other compensation).

iv.    Sale of the assets of the Company or the decision to obtain any loan or incur any obligation other than customary trade payables or Company Loans.

v.     The Company engaging in any business other than those related to the Purpose set forth above.

vi.    The execution of any material contracts by the Company, but only to the extent such agreement is with an Affiliate of a Member (in which case, the other Members' consent is required).

vii.   Any replacement of a Key Person (as defined below) following their death, incapacity or resignation.

viii.  Any partition of the assets of the Company.

ix.    Except as expressly permitted or required under provisions of this Agreement, any sale, option to sell, exchange, pledge, mortgage, security interest or other encumbrance, disposition or hypothecation of all or any portion of the Property or any interest therein.

x.     The taking of any of the following actions on behalf of the Company:  a voluntary commitment of any act of bankruptcy (or any other similar act of insolvency) or the filing of voluntary petition in bankruptcy; the filing of a voluntary petition or answer seeking reorganization or arrangement with creditors or seeking to take advantage of any insolvency laws; the application for or consent in writing to the appointment of a receiver for the Company or its assets; making a general assignment for the benefit of creditors; or filing any answer to a petition filed against the Company in any bankruptcy, reorganization or insolvency proceeding.

xi.    Any consolidation, merger, conversion or reorganization of the Company with or into any other form of legal entity or the issuance of any equity securities in the Company.

xii.   Except as otherwise provided in this Agreement, causing the dissolution or liquidation of the Company.

xiii.  All transactions outside the ordinary course of the Company's business, or that would be reasonably expected to have a substantial or material effect upon the Company or the Property.

xiv.   Any act in contravention of this Agreement or any other act which would make it impossible to carry on the ordinary business and affairs of the Company.

CONFIDENTIAL

DB0002375