# EXHIBIT 4
# 9/28/12 ZAVIN DECLARATION
# CASE NO. 12-4175-WHP

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


SPANSKI ENTERPRISES, INC.        )

and EUROVU, S.A.,                )

        Plaintiffs,          )        Case No.

      vs.                      )        12 CV 4175 (WHP)

INTERCOM VENTURES, LLC,          )        ECF CASE

INTERCOM POLAND, LLC, TONY       )

HOTI AND DYLAN BATES,            )

        Defendants.          )



Deposition of DYLAN PAUL BATES,

Chicago, Illinois

September 5, 2012

12:23 P.M.



Reported By:

Elia E. Carrion

Ref: 8148

```
 1
 2
 3                   September 5, 2012
 4                     12:23 P.M.
 5
 6          The deposition of DYLAN PAUL BATES,
 7   called as a witness herein for examination, taken
 8   pursuant to the Federal Rules of Civil Procedure of
 9   the United States District Courts pertaining to the
10   taking of depositions, taken before ELIA E. CARRIÓN,
11   CSR No. 084.004641, a Certified Shorthand Reporter
12   of said state, taken at Suite 2300, 321 North Clark
13   Street, Chicago, Illinois, on the 5th day of
14   September, 2012, at 12:23 P.M.
15
16
17
18
19
20
21
22
23
24
```

```
1    APPEARANCES:

2

3         LOEB & LOEB LLP,

4         345 Park Avenue,

5         New York, New York 10154

6         Tel:  212.407.4161

7         Fax:  212.658.9105

8         jzavin@loeb.com

9         By:  MR. JONATHAN ZAVIN, ESQ.

10             appeared on behalf of the Plaintiffs;

11

12        RICHARD E. STECK and ASSOCIATES,

13        19 South LaSalle Street, Suite 1500

14        Chicago, Illinois  60603

15        Tel:  312.236.4200

16        Fax:  312.896.5927

17        airsteck@usa.net

18        By:  MR. RICHARD E. STECK, ESQ.

19             appeared on behalf of Defendants

20             Intercom Ventures, LLC;

21             Intercom Poland, LLC; and Tony Hoti;

22

23

24
```

1    APPEARANCES (Continued):

2

3         LEYDIG, VOIT & MAYER, LTD., P.C.,

4         Two Prudential Plaza, Suite 4900

5         180 North Stetson Avenue

6         Chicago, Illinois   60601-6731

7         Tel:  312.616.5669

8         Fax:  312.616.5700

9         kparks@leydig.com

10        By:  MR. KEVIN C. PARKS, ESQ.

11             appeared on behalf of Defendant

12             Dylan Bates.

13

14

15

16

17

18

19

20

21

22

23

24

1    you've been deposed.

2        A.    Primarily medical.  I'm in the physical

3    therapy, outpatient physical therapy business; so

4    workers' comp litigation, primarily.

5        Q.    This is litigation involving your

6    company?

7        A.    Correct, yes.  Or clients.  You know,

8    they would -- work comp settlement type of situation

9    and/or one personal injury within one of our

10   facilities.

11       Q.    Okay.  Have you ever been involved in

12   personal litigation where you've been a plaintiff or

13   defendant and been deposed?

14       A.    No.

15       Q.    What is the company that you work for?

16       A.    ATI Physical Therapy.

17       Q.    And what's your position at that company?

18       A.    COO, chief operating officer.

19       Q.    How long have you been there?

20       A.    Thirteen years.

21       Q.    And just starting, just to get a little

22   background, could you tell me where you went to

23   college and when you graduated.

24       A.    I went to college at the University of

1    Wisconsin-La Crosse for physical therapy school and

2    graduated in 1999.

3        Q.    And what did you do following graduation?

4        A.    I joined with ATI.

5        Q.    Okay.  Did you have any other educational

6    credentials or experience after you graduated from

7    the University of Wisconsin?

8        A.    No.

9        Q.    Have you been involved in any businesses

10   other than ATI?

11       A.    Yes.

12       Q.    What businesses are those?

13       A.    Real estate, a number of different

14   entities and properties that we own on the

15   commercial side.

16       Q.    Well, let me pause you for a moment.

17   When you say "we own," who is the "we" that you're

18   talking about?

19       A.    Just a syndicate of other investors.

20       Q.    Okay.  And when did you get involved in

21   that, in the real estate business?

22       A.    It's been over the last, 10 to 12 years.

23       Q.    And what kind of properties are those?

24   Commercial?  Residential?

```
 1        A.    Commercial.

 2        Q.    Where are they located?

 3        A.    Throughout the western suburbs of

 4   Chicago.

 5        Q.    Are they all in the state of Illinois?

 6        A.    They are.

 7        Q.    Okay.  Any other businesses you have been

 8   involved in?

 9        A.    Yes.  I'm involved in the archery

10   business.  I own a compound boat company, as well as

11   a couple of accessory companies to the archery

12   industry.

13        Q.    Again --

14        MR. STECK:  I'm sorry.  What industry?

15        THE WITNESS:  Archery.

16   BY MR. ZAVIN:

17        Q.    You used the term "we."  Who is the "we"

18   in the archery business?

19        A.    A handful of other investors.

20        Q.    Are any of these other investors family

21   members?

22        A.    No.

23        Q.    The same question for real estate:  Are

24   any of the other --
```

1      A.      No.

2      Q.      -- investors family?  Okay.

3              What other businesses have you been

4    involved in?

5      A.      I was involved in another venture with

6    the Intercom Ventures gentleman.

7      Q.      What venture was that?

8      A.      That was a closed-circuit television

9    commercial programming for Ultimate Fighting, the

10   UFC.

11     Q.      What was the name of that business?

12     A.      It was called Catalyst Ventures.

13     Q.      Okay.  When did you become involved in

14   Catalyst Ventures?

15     A.      Approximately 2008, 2009.  2008, '9.  In

16   that time frame.

17     Q.      Okay.  I'd like to go through a little

18   more detail about Catalyst Ventures.  How did you

19   get involved in Catalyst Ventures?

20     A.      I was introduced to Tony and Drilon via a

21   common acquaintance.  And I had some contacts with

22   the UFC, and we worked out a deal to provide in bars

23   and restaurants the pay-per-view content for the

24   UFC.

1    Q.    So is it fair to say you lost the entire

2    ███████████████████?

3    A.    Correct.

4    Q.    Other than that initial investment, did

5    you have any further investment in Catalyst above

6    that ████████████?

7    A.    I don't understand that.

8    Q.    Well, my understanding -- and perhaps I'm

9    phrasing this badly.  My understanding was that

10   through this investment vehicle, you and your two

11   partners put in a █████████████, of which

12   approximately a ███████████ was yours; is that

13   correct?

14   A.    Correct.

15   Q.    Other than that initial ███████████,

16   were there any further funds put in Catalyst by you?

17   A.    I don't recall.  I don't think so.

18   Q.    Okay.  Why didn't Catalyst work, from a

19   financial point of view?

20   A.    A number of reasons.

21   Q.    Okay.  Briefly, you can tell me them.

22   A.    We had another partner that held the

23   commercial distribution rights for UFC that was

24   difficult to work with.

```
 1        Q.     Does that mean you didn't obtain the

 2   rights?

 3        A.     No.  We had -- we had an agreement with a

 4   company called "Joe Hand Promotions," which owns the

 5   exclusive rights in North America and a couple of

 6   other territories to deliver closed-circuit in

 7   commercial establishments for their pay-per-views.

 8   So they resale to other distributors such as DirecTV

 9   and Comcast and so forth.  And we were another

10   option to go in and provide the technology to -- to

11   deliver the signal.

12        Q.     And why didn't that business model work?

13        A.     Just there was lack of cooperation from

14   Joe Hand Promotions from an installation

15   perspective.  That's the crux of it.

16        Q.     Okay.  Am I correct that your involvement

17   with Mr. Hoti in Catalyst was prior to your

18   involvement with him in connection with Intercom

19   Poland?

20        A.     Correct.

21        Q.     Okay.  When did you first become involved

22   in Intercom Poland?

23        A.     I believe it was in 2010.

24        Q.     Well, why did you become involved in
```

1    Intercom Poland?

2        A.    It's -- you know, I look at various

3    investment opportunities, and I was presented with

4    an opportunity.

5        Q.    And who presented you with the

6    opportunity -- Mr. Hoti?

7        A.    Correct.

8        Q.    Okay.  And what did he tell you about the

9    opportunity at that time?

10       A.    He told me that they were going -- they

11   had a number of other platforms, and they were going

12   to launch a Polish platform, and there was an

13   investment opportunity.

14       Q.    And did you make it -- in fact, make a

15   deal with Mr. Hoti to invest in this opportunity?

16       A.    Conceptually.  And ultimately, it came to

17   fruition.

18       Q.    Did you invest in this venture

19   personally?

20       A.    There was an entity, DBPol, that invested

21   in Intercom Poland.

22       MR. ZAVIN:  Okay.  Let's mark this -- off the

23   record.

24              (WHEREUPON, discussion was had off

1                      the record.)

2          MR. ZAVIN:  Back on the record.

3          In an off-the-record discussion, we have

4    discussed the fact that there's as yet no

5    confidentiality agreement in place.  And per my

6    agreement with defendants' counsel, specifically

7    with Mr. Parks who is producing documents pursuant

8    to a document request, I agree that until we reach

9    either a confidentiality agreement or an impasse on

10   a confidentiality agreement, we will treat all of

11   the documents he's marked as "attorneys' eyes only"

12   as attorneys' eyes only.

13          Further, what I've agreed to for the purposes

14   of today's deposition is to the extent there is

15   specifically a question about a document that's been

16   marked attorneys' eyes only, any response -- that

17   question response, specifically about the document,

18   I will treat as attorneys' eyes only until such time

19   as we've -- the document has been redesignated or

20   there is an impasse on it and we have to go to the

21   Court.

22          MR. STECK:  Let me just add to that that I

23   expect to be included in the agreement about these

24   documents, many of which are those of my client,

1    Intercom Poland, or copies of documents of my

2    client.

3        MR. ZAVIN:  Well, technically, these were not

4    documents produced by your client, and my agreement

5    was with Mr. Parks.  But I assume that Mr. Parks

6    will protect your client's interest with respect to

7    these documents.

8                    (WHEREUPON, a certain document was

9                    marked Plaintiffs' Deposition

10                   Exhibit No. 1, for identification,

11                   as of September 5, 2012.)

12                   (WHEREUPON, the document was

13                   tendered to the witness.)

14   BY MR. ZAVIN:

15       Q.    Okay.  Mr. Bates, I have placed in front

16   of you a document that's been marked as Plaintiffs'

17   Exhibit 1.

18             Do you recognize that document?

19       A.    Vaguely.

20       Q.    Do you know what it is?

21       A.    After looking at it, I know what it is.

22       Q.    Well, that's what I'm asking.  That's why

23   I put it in front of you.

24       A.    Yes.  Yes.

1          Q.    What is it?

2          A.    It's the operating agreement for

3    DBPol, LLC.

4          Q.    Okay.  And looking at what has been

5    marked as Bates Number DB2335, which is the

6    second-to-last page, is that in fact your signature?

7          A.    Yes.

8          Q.    Okay.  Without looking at the document

9    for the moment, do you remember the basis on which

10   DBPol was formed?

11         A.    I don't understand your question.

12         Q.    Well, is -- was this set up as a vehicle

13   whose sole purpose was to invest in Intercom Poland?

14         A.    It's -- it's an Illinois LLC -- or it's

15   an LLC; I don't know which state it was formed in --

16   that could have been used for anything.

17         Q.    Okay.  What does "DB" stand for in DBPol?

18         A.    You tell me.

19         Q.    Well, do you really not know?

20         A.    It most likely stands for my name.

21         Q.    Okay.  And what is --

22         A.    Which is Dylan Bates.

23         Q.    Right.  And what does "Pol" stand for?

24         A.    Most likely Poland.

1    Q.    Okay.  Is this a single-member entity?

2    A.    From what I understand.

3    Q.    Well, do you have a recollection whether

4    it is?

5    A.    I -- I do not.

6    Q.    Okay.  Well, let's look at Bates stamp --

7    the first page of the document after the index is

8    Bates-stamped 2328.  Does it say in the second

9    whereas:  "The member desires to establish a

10   single-member limited liability company"?

11   A.    Okay.  Then it is a single-member LLC.

12   Q.    As a matter of fact, Mr. Bates, you were

13   the sole member of this company; correct?

14   A.    Yes.

15   Q.    And you owned a hundred percent of it;

16   correct?

17   A.    Correct.

18   Q.    And you had complete and utter control

19   over this company, didn't you?

20   A.    As a single member, I would imagine

21   that's the definition.

22   Q.    So there's no other human being in the

23   world who had any input whatsoever into what this

24   company did.

1        A.    I guess not.

2        Q.    Okay.  After you set up this company

3    and -- let's see.  The agreement says -- it's dated

4    September, blank, 2010.  Do you know whether the

5    company was set up in or about September 2010?

6        A.    I imagine, if that's the date on it.  I

7    don't recall specifically.

8        MR. PARKS:  Well, Mr. Bates, I just want to

9    remind you I don't want you to guess.  If you know,

10   if you recall, you can say so.  But don't guess.

11   BY THE WITNESS:

12       A.    I don't recall.

13       MR. ZAVIN:  Okay.  Let's mark this as

14   exhibit -- Plaintiffs' Exhibit 2.

15                   (WHEREUPON, a certain document was

16                   marked Plaintiffs' Deposition

17                   Exhibit No. 2, for identification,

18                   as of September 5, 2012.)

19                   (WHEREUPON, the document was

20                   tendered to the witness.)

21   BY MR. ZAVIN:

22       Q.    Mr. Bates, I'm showing you a two-page

23   document that's marked as Plaintiffs' Exhibit 2.

24                   Do you recognize that document?

```
 1    collaborative discussion and there was an agreement.

 2         Q.    Mr. Bates -- did he disagree with the

 3    recommendation?

 4         A.    I don't recall that.

 5         Q.    Okay.  Let's take a look at this

 6    document, which we'll mark as Plaintiffs' Exhibit 5.

 7                    (WHEREUPON, a certain document was

 8                    marked Plaintiffs' Deposition

 9                    Exhibit No. 5, for identification,

10                    as of September 5, 2012.)

11                    (WHEREUPON, the document was

12                    tendered to the witness.)

13    BY MR. ZAVIN:

14         Q.    Mr. Bates, do you recognize this

15    document?

16         A.    I don't recognize this particular

17    document.  If I read through it, I can maybe comment

18    on the content.

19         Q.    Well, would you read it.  It appears to

20    be an e-mail dated October 8, from you to Mr. Hoti.

21         A.    Okay.

22         Q.    Okay.  Now, please feel free to take your

23    time and read through it and see whether that

24    refreshes your recollection as to the document.
```

1    A.    Yeah, I think it's reflective of what I

2    have already said -- that it was collaborative in

3    nature.

4    Q.    But isn't it fair to say that Mr. Hoti's

5    at least initial reaction was he was not in favor of

6    Mr. Castellano as the operating officer?

7    A.    I actually see the word "surprised."

8    Q.    Okay.  And what did he say after he was

9    surprised?  After, in this or some subsequent

10   conversation or e-mail.

11   A.    That he needs a couple of days to think

12   about it because he was surprised.

13   Q.    And you said that your comfort level is

14   high with Nunzio; is that correct?

15   A.    If -- if I -- if it's in this e-mail,

16   that's what I said.

17   Q.    Okay.  And he did, in fact, become the

18   operations manager of Intercom Poland; is that

19   correct?

20   A.    Correct.

21   Q.    Were you involved in the hiring of other

22   people for Intercom Poland?

23   A.    I attended two interviews.

24   Q.    With whom?

```
 1        A.    Lukasz.  What was his name?  I don't know
 2   his last name.  And the other professional is -- her
 3   name was Isabella, who I think was hired in a
 4   marketing role.
 5        Q.    Why were you attending those interviews?
 6        A.    Because I was going to invest ████████
 7   in the venture.
 8        Q.    Is it fair to say you wanted some control
 9   over the venture?
10        MR. PARKS:  Object to the form of the question.
11   BY MR. ZAVIN:
12        Q.    You can answer.
13        A.    I think anyone in their right mind that
14   puts money into something would like to be a
15   contributor, especially in the beginning stages, to
16   set it up for potential success.
17        Q.    Well, actually, you insisted on being
18   much more than a contributor, didn't you?
19        MR. PARKS:  Object to the form of the question.
20   It's argumentative.
21        You can answer.
22   BY MR. ZAVIN:
23        Q.    You didn't insist on having control?
24        A.    I did not insist on having control.
```

Page 33

```
 1          Q.    Who was the manager of Intercom Poland?
 2          MR. PARKS:  Objection.  Asked and answered.
 3          You can answer.
 4          MR. ZAVIN:  By the way, that is incorrect.  It
 5     has not been asked and answered.
 6     BY THE WITNESS:
 7          A.    DBPol.
 8     BY MR. ZAVIN:
 9          Q.    And DBPol was the manager; and it had
10     control over Intercom Ventures, did it not?
11          A.    At what point in time?
12          Q.    Well, is there any point in time when it
13     didn't have control over Intercom Ventures --
14     Intercom Poland?
15          A.    It was based on the stipulations of
16     return on capital, which obviously, as you know, did
17     not happen.
18          Q.    Okay.  So it's a simple question.
19          Is there any time from its formation to
20     the present where DBPol has not had -- been the
21     manager and had control over Intercom Poland?
22          MR. PARKS:  Object to the form.
23          You can answer.
24
```

```
 1    BY THE WITNESS:

 2         A.    I guess you could say legally on paper,

 3    in black and white, exercised, no.

 4    BY MR. ZAVIN:

 5         Q.    Let's -- let's stick with legally.  Is

 6    there any time since its formation to the current,

 7    present date that Intercom -- that DBPol has not

 8    been the manager of Intercom Poland?

 9         A.    No.

10         Q.    There's been no time when it was not the

11    manager?

12         A.    Nope.

13         Q.    So it is the manager, as we speak;

14    correct?

15         A.    From what I understand.

16         Q.    And what are the powers of the manager of

17    Intercom Poland?

18         A.    I wouldn't be able to tell you that.

19         Q.    Was there a limited liability company

20    agreement with respect to Intercom Poland?

21         A.    Yes.

22         Q.    Was that a negotiated agreement?

23         A.    Yes.

24         Q.    Were you involved in the negotiation of
```

Page 35

1    that agreement?

2         A.    Yes.

3         Q.    Did you have your own counsel with

4    respect to the negotiation of that agreement?

5         A.    Dan Cole acted on my behalf in that

6    negotiation.

7         Q.    So Mr. Cole was your counsel with respect

8    to that negotiation; is that correct?

9         A.    Correct.

10        Q.    And who was representing Mr. Hoti?

11        A.    I do believe it was Rick Steck.

12        Q.    Who were the parties to that agreement,

13   that -- when I say "that agreement," the limited

14   liability company agreement?

15        A.    DBPol, Intercom Ventures Poland, and

16   Round Grove.

17        Q.    Who is Round Grove?

18        A.    I don't know.

19        Q.    Do you associate a person with Round

20   Grove?

21        A.    I do believe it was a gentleman by the

22   name of Jerry Weller, who I think I met in the

23   office one time.

24        Q.    Why was he a partner of Intercom Poland?

1       A.     Yep.

2       Q.     And am I correct that this Section 3.1

3    sets forth the required capital contribution of the

4    members?

5       A.     Correct.

6       Q.     What was the DBPol capital contribution

7    requirement?

8       A.     ███████████

9       Q.     Did you, in fact -- did DBPol, in fact,

10   invest ████████?

11      A.     Yes.

12      Q.     Where did DBPol get that ██████ from?

13      A.     From its member.

14      Q.     And that was you; is that correct?

15      A.     Yes.

16      Q.     And so that was your -- personally, that

17   was your ████████; is that correct?

18      A.     Well, it was DBPol's ███████.

19      Q.     Well, before you -- before it was

20   received by DBPol, was it your personal fund?

21      A.     Yeah, I guess so.

22      Q.     Okay.  Was anyone else required to make a

23   capital contribution?

24      A.     Not that I recall.

1      Q.    And without going too much into details,

2    let's see if you can remember this and we can agree

3    on it.

4            Was there a provision for additional

5    capital contribution by members?

6      A.    I think there was a provision that

7    members had the option, if it needed capital above

8    the ██████████.

9      Q.    Okay.  Did you, in fact, make

10   additional -- or did DBPol make additional capital

11   contributions above the ██████████?

12     A.    Yes.

13     Q.    How much additional capital contribution

14   did it make?

15     A.    Approximately ████████.

16     Q.    And that ████████ was also your personal

17   funds before it went to DBPol?

18     A.    Yes.

19     Q.    Okay.

20            (Court reporter clarification.)

21     MR. ZAVIN:  Off the record.

22            (WHEREUPON, discussion was had off

23            the record.)

24   BY MR. ZAVIN:

1      Q.    What was the provision for return of

2   capital to the members?

3      A.    I think it was the capital would be

4   repaid, plus a 50 percent risk premium.

5      Q.    Okay.  The risk premium that you

6   discussed, that you just mentioned, that was

7   provided for in Paragraph 3.1.4 on this same page?

8      A.    Yes.

9      Q.    How was capital to come out?

10     A.    It changed a few times.  I don't know the

11  exact -- what we landed on.

12     Q.    But is it fair to say that the actual

13  capital contribution was to come out on a more

14  favored basis?

15     A.    Yes.  It was a preferred -- I think what

16  it was, it was going to be 75 percent; you know, if

17  you distribute $100, then 75 was supposed to come to

18  me and 25 to the other members.  And then after the

19  capital and risk premium were repaid, that was going

20  to flip pursuant to the membership interest in the

21  entity.  So I would have had 25 percent, which was

22  per the operating agreement, post return of capital

23  and risk premium.

24     Q.    Okay.  But prior to capital having come

```
 1    out, you were to get money on a preferred basis,
 2    75 percent of distribution?
 3         A.    I think so.
 4         Q.    Did that percentage ever increase?
 5         A.    No.  There was talk of it increasing.  It
 6    never did.
 7         Q.    Again, I'm not trying to trick you, but
 8    is there any time it went to 90 percent?
 9         A.    It could have gone -- like I said, there
10    was a couple of times when it -- I don't know
11    exactly what was memorialized in here.  Because we
12    sat in Dan Cole's office, and it was either going to
13    be 75/25 or 90/10.  And it escapes me what we ended
14    up signing up for.  So we could probably find it in
15    here but...
16         Q.    Okay.  Well, just to help the process
17    along, can you turn to page 7 of the agreement?
18         A.    Okay.
19         Q.    Which is Bates-stamped DB0002355.
20         A.    Yep.
21         Q.    There's an Article IV, which is Profit,
22    Loss, and Distributions; is that correct?
23         A.    Yes.
24         Q.    Okay.  And 4.1.1(a), I think, reflects
```

1    what you just testified to -- that there's a

2    75 percent to DBPol.

3         A.    Yeah.

4         Q.    Is that correct?

5         A.    Yep.

6         Q.    Now, following this, the signing of this

7    agreement which did reflect the 75 percent, my

8    question was:  At any time later, was that

9    arrangement changed?

10        A.    I think there were discussions, but we

11   never memorialized it with a changed operating

12   agreement, from my recollection.

13        Q.    Okay.  Now, were there any control

14   provisions connected with the repayment of capital

15   contributions?

16        A.    Yeah.  I think it was going to revert to

17   the membership interest upon repayment of capital.

18   That's my recollection.

19        Q.    Okay.  Can I direct your attention on

20   page 9 to Section 4.6.  Why don't you take a moment

21   and read that.

22        A.    (Witness complies.)

23              Yeah.  I don't understand it, legal

24   speak.

1      Q.    Well, looking at the second sentence, it

2    says:  "In the event, and for so long as, any unpaid

3    capital contributions remain outstanding and the

4    company is not expected to generate any additional

5    distributable net cash or additional proceeds from

6    the sale of STBs, then Intercom agrees that" -- and

7    I'm going to skip over (x) and go to (y) --

8    "notwithstanding anything contained herein to the

9    contrary, DBPol will have the exclusive control and

10   make all decisions regarding the company without any

11   vote by Intercom during such period."

12            Do you see that?

13      A.    Yeah.  I think -- I think this is

14   basically -- I thought that this was about -- I

15   think this was a protection for like the downside

16   scenario, if it ends up if things --

17            You know, the way I read it, and I think

18   I recall, if they're sent out box inventory or

19   there's assets and things go south, I think there

20   was something about that that might tie to it.  I

21   don't -- I don't --

22      Q.    Well --

23      A.    This is a few years ago; so I don't know

24   exactly.

1      Q.    Has there been a downside scenario at

2    Intercom Poland?

3      A.    A little bit, yes.

4      Q.    I think we'd all agree that --

5      A.    Yes.

6      Q.    Yes.

7            And under that scenario, DBPol has

8    exclusive control and makes all the decisions

9    regarding Intercom Poland; is that correct?

10     A.    It --

11     MR. PARKS:  Object to the form.

12     You can answer.

13   BY THE WITNESS:

14     A.    In this document, as you can see that I

15   cannot figure it out, even looking at this document,

16   understand what that means from a control

17   perspective; but as I said earlier, I have not

18   imparted any control or direction over this entity

19   or exercised rights that might be on this document.

20   BY MR. ZAVIN:

21     Q.    Well, let's -- let's look at -- you know,

22   I understand that's your position, Mr. Bates.

23           But let's look a little further at the

24   document that goes to Article V, Management:

1    Rights, Powers, and Duties, on page 10.  Do you

2    recall this provision?

3        A.    I do not.

4        Q.    Okay.  Why don't you take a moment and

5    read through, at least through 5.1.3.

6        A.    Okay.

7        Q.    Just tell me when you're done.

8        A.    Okay.  I'm good.

9        Q.    Okay.

10       A.    So this says we have to agree on major

11   decisions.

12       Q.    Well, actually, Mr. Bates, that isn't

13   what -- completely what it says, does it?

14       A.    It says the manager, or the management

15   committee, will provide written notice to the

16   members of any major decisions, but it will require

17   prior written approval of both Intercom and DBPol.

18       Q.    Okay.  Well, let's look first -- who is

19   the manager of Intercom Poland?

20       A.    DBPol.

21       Q.    And what is the power of the manager?

22       A.    I don't know.  It says here, the major

23   decision will require written approval of both

24   Intercom and DBPol.

1          Q.     Well, major decisions are specifically

2   defined in this agreement, are they not?

3          A.     Correct.  It points to it.

4          Q.     And that is on the exhibit to the

5   agreement; correct?

6          A.     Yep.

7          Q.     All of the decisions are to be made by

8   the manager; is that correct?

9          A.     I -- define "all of the decisions."

10         Q.     Well, doesn't 5.1.2 very specifically

11   say:  "The manager or the management committee will

12   have the authority to make all expenditures that

13   constitute approved expenses and engage in any acts

14   and transactions on behalf of the company that are

15   consistent with the purpose"?

16         A.     This document here, if we want to read

17   that, was never followed.

18         Q.     Mr. Bates, I understand that you have a

19   belief in what happened and you have your legal

20   position.  But at the moment I'd appreciate it if

21   you'd just answer the questions.

22           This document, what we're talking about,

23   is this document at the moment.  Doesn't it provide

24   that the manager should have -- has the authority to

Page 49

1    engage in any acts and transactions on behalf of the

2    company?

3         A.    The document --

4         MR. PARKS:  I object to the form of the

5    question.  And the document speaks for itself.

6         You can answer.

7    BY THE WITNESS:

8         A.    Yeah, I think that it's in black and

9    white.  The document gives authority.

10   BY MR. ZAVIN:

11        Q.    Okay.  And the manager will remain the

12   manager so long as the capital contribution hasn't

13   been paid back; correct?

14        A.    Yes.

15        Q.    And I think we've already agreed that

16   that your capital -- DBPol's capital contribution

17   has never been paid back and DBPol was and is --

18   remains the manager; is that correct?

19        A.    Yes.

20        Q.    And as a matter of fact, DBPol was the

21   manager of Intercom Poland in May of 2012; correct?

22        MR. PARKS:  Objection.  Asked and answered more

23   than once.

24        You can answer it again.

1    BY THE WITNESS:

2         A.    Technically, yes.

3    BY MR. ZAVIN:

4         Q.    And it was the manager in June of 2012;

5    is that correct?

6         A.    Yes.

7         MR. PARKS:  Same objection.

8    BY MR. ZAVIN:

9         Q.    You're designated the key person under

10   this agreement, are you not?

11        A.    Yeah.

12        Q.    And did you -- were you ever in breach of

13   this agreement?  Or was DBPol -- you personally or

14   DBPol ever in breach of this agreement?

15        MR. PARKS:  Object to the form.

16   BY THE WITNESS:

17        A.    I don't understand where you're going

18   with that.

19   BY MR. ZAVIN:

20        Q.    It's a simple question.  Where I'm going

21   is not relevant.

22        A.    Define "breach."

23        Q.    Did you follow all of the requirements of

24   this agreement that the agreement imposed on you

```
 1    personally or on DBPol?

 2         A.    I still think that I don't understand

 3    your question.

 4         Q.    Are you aware of any time that you did

 5    not do what was required of you under this

 6    agreement?

 7         A.    You asked in the context of a key person.

 8         Q.    I'm asking you in the context of this

 9    agreement.  Are you aware of any time --

10         A.    No.

11         Q.    You are not aware of any such time?

12         A.    I -- I need it more defined.

13         Q.    Well, you understand that you had

14    obligations under this agreement?

15         A.    I do understand that.

16         Q.    And what were those obligations?  And

17    when I say "you," I mean --

18         A.    To devote appropriate amounts of time as

19    necessary to accomplish the needs of the company.

20         Q.    Did you do that?

21         A.    In the initial stages, I gave some

22    guidance in terms of my business acumen.

23         Q.    Define "initial stages."

24         A.    In the first few months, I was -- I was
```

Page 52

1    involved from a strategic perspective and kept

2    apprised, as any reasonable person would expect with

3    this type of investment, of the happenings and

4    results of the day-to-day operations of the

5    organization.

6        Q.    And were you kept apprised of the

7    operations of this company right through June

8    of 2012?

9        A.    Not all the time.

10       Q.    But generally, isn't it fair to say you

11   were kept apprised at -- of the --

12       A.    Intermittently, as evidenced by the

13   discovery.

14       Q.    Well, there will probably be further

15   discovery on that from other people's e-mails and

16   testimony.  But what do you think your involvement

17   was through June of 2012?

18       A.    How broad do you want to go?  I don't

19   understand.

20       Q.    Well, how often did you have

21   conversations with anyone involved with Intercom

22   Poland, either by telephone, in person, or via

23   e-mail?

24       A.    Very infrequently.  You know, I actually

```
1    through 3685.  And it appears to be an e-mail from

2    you -- I'm sorry -- withdrawn -- from Mr. Hoti to

3    you, also dated May 23, 2012, in which he forwards

4    an e-mail from someone at TVN.

5             Do you recall receiving this e-mail?

6        A.    I don't.

7        Q.    Do you have any reason to think you

8    didn't receive it?

9        A.    Like I said, I get a lot of e-mails.  So

10   it looks like it was received, as my assistant

11   printed it off.

12       MR. ZAVIN:  Let's mark this as Exhibit 37.

13               (WHEREUPON, a certain document was

14               marked Plaintiffs' Deposition

15               Exhibit No. 37, for identification,

16               as of September 5, 2012.)

17               (WHEREUPON, the document was

18               tendered to the witness.)

19   BY MR. ZAVIN:

20       Q.    I'm showing you a document that is the

21   original Summons and Complaint in this lawsuit.

22   When did you first see this?

23       MR. PARKS:  Object to the form of the question.

24
```

Page 149

1    BY THE WITNESS:

2         A.    I -- I don't recall.  I don't know if

3    I've ever seen this.  This was never served to me.

4    BY MR. ZAVIN:

5         Q.    You're named as a defendant in this

6    lawsuit; correct?  Personally.

7         A.    Uh-huh.

8         Q.    How many other times have you been named

9    as a defendant -- how many lawsuits have you

10   personally been named as a defendant?

11        A.    Very -- I -- I don't recall.

12        Q.    Does that mean you don't recall any

13   others where you were personally named as a

14   defendant?

15        A.    Personally, yeah, I don't think I ever

16   have been.

17        Q.    And you don't recall when you -- the

18   circumstances under which you first saw this?

19        A.    Correct.  I was told at a certain

20   point --

21        THE WITNESS:  And I think, Rick, we had a brief

22   call.

23        I don't remember the date of that, just to go

24   over the basics of it.  I don't recall that.

1      MR. ZAVIN:  Maybe this will refresh your

2   recollection.  Let's mark this as Exhibit 38.

3                    (WHEREUPON, a certain document was

4                    marked Plaintiffs' Deposition

5                    Exhibit No. 38, for identification,

6                    as of September 5, 2012.)

7                    (WHEREUPON, the document was

8                    tendered to the witness.)

9   BY MR. ZAVIN:

10      Q.    Exhibit 38 is a one-page e-mail from

11   Mr. Castellano to Mr. Hoti, Mr. Qehaja, and you.

12      A.    Uh-huh.

13      Q.    It's dated May 25, 2012, which is the

14   same date that the Summons is dated on the prior

15   exhibit; is that correct?

16      A.    It appears so.

17      Q.    And in this e-mail, Mr. Castellano

18   purports to be sending the three of you copies of

19   the lawsuit.  And there's an attachment indicated.

20          Do you see that?

21      A.    I do.

22      Q.    Do you recall getting this e-mail?

23      A.    Vaguely, but I don't know when it -- when

24   I received it.

Page 151

1      Q.    Well, do you have any reason to think you

2   didn't receive it on May 25th?

3      A.    Like I said, I -- it could have been the

4   next week sometime and I -- I can't nail down the

5   date.  I sometimes don't check e-mail over the

6   weekends, and I often take Friday afternoon off.  So

7   I don't know when I -- so I don't know.

8      Q.    So your testimony is, even though you've

9   never been sued personally before, you have no

10  recollection of when you received a copy of a

11  lawsuit in which you were personally sued?

12     A.    Calendar date?  No, I don't.  I don't

13  have recollection of that.

14     Q.    Okay.  And once you became aware of that

15  lawsuit, what action did you take?

16     A.    From my recollection, I got -- I got drug

17  back into it and was asked to call Bob to try to

18  come to terms.

19     Q.    When you became aware of the lawsuit, did

20  you read a copy of the Complaint?

21     A.    I -- I think I might have skimmed it at

22  some point.

23     Q.    Did you know what you were being sued

24  for?

1          A.     I didn't fully understand what the issue

2     was.

3          Q.     When you found out you were being

4     personally sued, did you call counsel?

5          THE WITNESS:  And, Rick, I can't recall when

6     you got involved.  It might have been for the

7     preliminary injunction at that time.  I think you

8     were going to represent Intercom Poland at that

9     point.

10          And so that was the extent of our dialogue

11     with -- with counsel, per se.

12     BY MR. ZAVIN:

13          Q.     Okay.  Now, I'm asking you a slightly

14     different question.  Maybe your answer is the same,

15     but the question is slightly different.

16               You were personally sued in this lawsuit.

17     Did you contact counsel with respect to the fact

18     that you were personally sued?

19          A.     We had one conference call, just to -- to

20     kind of frame up -- frame up the issue.  And then

21     the next notice after I had talked to Bob was an

22     e-mail that said, Hey, we're going to let these

23     parties try to work out a deal.  And so I can't nail

24     the exact time frame.

Page 153

1          Q.      Were you --

2          A.      That's what I recall.

3          Q.      Were you aware that this lawsuit was

4     suing you for copyright infringement for the

5     continued broadcast of programming on Intercom

6     Poland?

7          MR. PARKS:   Object to the question, in that

8     it -- there's no time reference.

9     BY MR. ZAVIN:

10         Q.      Were you --

11         A.      I guess I -- yeah, no time reference.

12    But also, as I've said a few times, there were

13    numerous, you know, letters that you've brought out

14    here and numerous e-mails from other vendors saying,

15    Hey, there's issues going on here.  I probably

16    didn't park on the fact and say, Hey, listen, sit

17    down and really pay attention to this.

18              I didn't figure we'd be sitting here,

19    being tens of thousands of dollars later, in the

20    muck of this thing.  So I did not probably give it

21    its due from a standpoint of saying, Hey, you know,

22    this is about me personally.  As I never saw the

23    May 16 letter, I never said push play and continue

24    to broadcast this stuff.  And so after I talked to

1    Bob, I was like, Hey, maybe we can work out a deal

2    here.

3         Q.    Mr. Bates, how soon after May 25 did you

4    have an understanding that you and Intercom Poland

5    were being sued for copyright infringement for the

6    continued broadcast of EuroVu programs?

7         A.    I've always -- I always have said that

8    this was -- that this has been a contract issue

9    going back and forth about dollars owed and so

10   forth.  This is well after the fact.  Probably when

11   I -- when I met with my counsel sitting here today,

12   Kevin Parks, that I fully understand that I

13   personally was having a finger pointed at me saying,

14   Hey, Dylan Bates, you contributed to this and you

15   continued to push play and instructed people in your

16   manager's chair to continue to do that.  That,

17   frankly, just flat-out did not happen.

18        Q.    Did you ever instruct someone not to

19   broadcast the programs?

20        A.    I wasn't there.  I haven't been in the

21   office in a year.

22        Q.    Mr. Bates, the answer is yes or no.  Did

23   you or DBPoland -- DBPol ever instruct or take any

24   steps to stop Intercom Poland from broadcasting

```
 1                    tendered to the witness.)

 2   BY MR. ZAVIN:

 3        Q.    Mr. Bates, I've marked as Exhibit 42 a

 4   declaration that you submitted in this lawsuit.

 5              Do you recognize this document?

 6        A.    I do.

 7        Q.    And it appears to -- it's not

 8   Bates-stamped, but it's a six-page declaration dated

 9   August 31, 2012; is that correct?

10        A.    Yep.

11        Q.    Did you, in fact, sign this on page 6 of

12   the declaration?

13        A.    I did.

14        Q.    Did you review this declaration --

15        A.    I did.

16        Q.    -- before you signed it?

17        A.    Yep.

18        Q.    On -- in paragraph 17 of this

19   declaration, you say that you did not participate or

20   contribute in any way to any decision by Intercom

21   Poland to continue broadcasting programs to

22   subscribers after May 18, 2012; is that correct?

23        MR. PARKS:  I object to the form of that

24   question because it's not a correct reading of the
```

1    document.

2         MR. ZAVIN:  Well, he can read through the

3    document.  I didn't read all of it, but I'm happy to

4    read the entire paragraph into the record, which I

5    will.

6         MR. PARKS:  Okay.

7    BY MR. ZAVIN:

8         Q.    You stated in paragraph 17:  "I did not

9    participate in or contribute in any way to any

10   decision that may have been made by Intercom

11   Ventures or Intercom Poland to continue broadcasting

12   any programing to subscribers in any location after

13   midnight on May 18, 2012."

14            Do you see that?

15        A.    Correct.

16        Q.    Okay.  First question:  Am I correct that

17   there are subscribe -- Intercom Poland has

18   subscribers in New York?

19        A.    I -- I couldn't give you the -- where the

20   subscribers are.

21        Q.    Well, there are -- there were

22   approximately how many subscribers?  2,000?  3,000?

23        A.    I don't know the latest count.

24        Q.    Well, is that approximately correct, as

Page 166

1    of the spring of 2012?

2        A.    Probably directionally.  Anywhere within

3    those goal posts.  I don't know.

4        Q.    Okay.  Do you have any reason to think

5    that none of them were in New York -- the

6    state of New York?

7        A.    Do I have any reason to think that none

8    of them were?

9        Q.    None of them were in the

10   state of New York.

11       A.    I imagine there are a few in New York.

12       Q.    Okay.  And you're saying you did not make

13   the decision to continue broadcasting.  Who did?

14       A.    I don't know.

15       MR. PARKS:  I object to the form of the

16   question; because, again, that -- that

17   mischaracterizes the prior testimony, and it

18   mischaracterizes the statement in the declaration.

19       MR. STECK:  I object to the lack of foundation.

20   BY MR. ZAVIN:

21       Q.    Okay.  Mr. Bates, if you're not

22   responsible for what Intercom Poland does, who is

23   responsible?

24       MR. STECK:  I object to the question.  There's

1    absolutely no foundation of any kind for it.

2         MR. PARKS:  Yes.  I object on the same basis.

3    There's absolutely no context.

4    BY MR. ZAVIN:

5         Q.    You can answer.

6         A.    I don't know.

7         Q.    You're saying that you're the sole

8    investor --

9         A.    Yeah.

10        Q.    -- in terms of money.

11             DBPol is the managing member.

12        A.    Yeah.

13        Q.    And you have no idea who makes the

14   decisions for Intercom Poland?

15        MR. PARKS:  Object to the form of the question.

16   Mischaracterizes a lot of prior testimony.

17        You can answer.

18        MR. STECK:  And I object for lack of

19   foundation.

20   BY THE WITNESS:

21        A.    I imagine it's the people that report to

22   the office every day and show up and are in active

23   dialogue with Bob Spanski throughout the whole --

24   the last year and a half.

Page 191

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF NEW YORK

3

4    SPANSKI ENTERPRISES, INC.      )

5    and EUROVU, S.A.,              )

6              Plaintiffs,          )     Case No.

7         vs.                       )     12 CV 4175 (WHP)

8    INTERCOM VENTURES, LLC,        )     ECF CASE

9    INTERCOM POLAND, LLC, TONY     )

10   HOTI AND DYLAN BATES,          )

11             Defendants.          )

12

13            I hereby certify that I have read the

14   foregoing transcript of my deposition given at the

15   time and place aforesaid, consisting of Pages 1 to

16   184, inclusive, and I do again subscribe and make

17   oath that the same is a true, correct and complete

18   transcript of my deposition so given as aforesaid,

19   and includes changes, if any, so made by me.

20                     DYLAN PAUL BATES

21   SUBSCRIBED AND SWORN TO

22   before me this *18th* day

23   of *September* , A.D. 2012.

24        Notary Public  *Susan G. Pankow*

OFFICIAL SEAL
SUSAN G PANKOW
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/02/2015

Page 192

```
 1              DEPOSITION ERRATA SHEET

 2

 3    Assignment No. 8148

 4    Case Caption:  SPANSKI ENTERPRISES, INC., et al., v.

 5    INTERCOM VENTURES, LLC, et al.

 6

 7          DECLARATION UNDER PENALTY OF PERJURY

 8          I declare under penalty of perjury that I have

 9    read the entire transcript of my Deposition taken in

10    the captioned matter or the same has been read to

11    me, and the same is true and accurate, save and

12    except for changes and/or corrections, if any, as

13    indicated by me on the DEPOSITION ERRATA SHEET

14    hereof, with the understanding that I offer these

15    changes as if still under oath.

16          Signed on the  18th  day of

17    September , 2012 .

18    _____

19              DYLAN PAUL BATES

20

21

22

23

24
```