EXHIBIT E

10/5/12 PARKS DECLARATION

CASE NO. 12-4175-WHP

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

SPANSKI ENTERPRISES, INC.      )
and EUROVU, S.A.,              )
        Plaintiffs,        )     Case No.
    vs.                        )     12 CV 4175 (WHP)
INTERCOM VENTURES, LLC,        )     ECF CASE
INTERCOM POLAND, LLC, TONY     )
HOTI AND DYLAN BATES,          )
        Defendants.        )

Deposition of DYLAN PAUL BATES,

Chicago, Illinois

September 5, 2012

12:23 P.M.

Reported By:

Elia E. Carrion

Ref: 8148

1

2

3              September 5, 2012

4                 12:23 P.M.

5

6          The deposition of DYLAN PAUL BATES,

7   called as a witness herein for examination, taken

8   pursuant to the Federal Rules of Civil Procedure of

9   the United States District Courts pertaining to the

10  taking of depositions, taken before ELIA E. CARRIÓN,

11  CSR No. 084.004641, a Certified Shorthand Reporter

12  of said state, taken at Suite 2300, 321 North Clark

13  Street, Chicago, Illinois, on the 5th day of

14  September, 2012, at 12:23 P.M.

15

16

17

18

19

20

21

22

23

24

1    APPEARANCES:

2

3         LOEB & LOEB LLP,

4         345 Park Avenue,

5         New York, New York 10154

6         Tel:  212.407.4161

7         Fax:  212.658.9105

8         jzavin@loeb.com

9         By:  MR. JONATHAN ZAVIN, ESQ.

10              appeared on behalf of the Plaintiffs;

11

12        RICHARD E. STECK and ASSOCIATES,

13        19 South LaSalle Street, Suite 1500

14        Chicago, Illinois  60603

15        Tel:  312.236.4200

16        Fax:  312.896.5927

17        airsteck@usa.net

18        By:  MR. RICHARD E. STECK, ESQ.

19             appeared on behalf of Defendants

20             Intercom Ventures, LLC;

21             Intercom Poland, LLC; and Tony Hoti;

22

23

24

```
 1     APPEARANCES (Continued):

 2

 3          LEYDIG, VOIT & MAYER, LTD., P.C.,

 4          Two Prudential Plaza, Suite 4900

 5          180 North Stetson Avenue

 6          Chicago, Illinois  60601-6731

 7          Tel:  312.616.5669

 8          Fax:  312.616.5700

 9          kparks@leydig.com

10          By:  MR. KEVIN C. PARKS, ESQ.

11               appeared on behalf of Defendant

12               Dylan Bates.

13

14

15

16

17

18

19

20

21

22

23

24
```

1                    (WHEREUPON, the witness was duly
2               sworn.)
3               DYLAN PAUL BATES,
4    called as a witness, having been duly sworn, was
5    examined and testified as follows:
6                      EXAMINATION
7    BY MR. ZAVIN:
8        Q.   Mr. Bates, my name is Jonathan Zavin.
9    I'm a partner at the firm of Loeb & Loeb, and I
10   represent the two plaintiffs in an action which is
11   entitled Spanski Enterprises, Inc. and EuroVu, S.A.
12   against four defendants:  Intercom Ventures, LLC;
13   Intercom Poland, LLC; Tony Hoti; and yourself, Dylan
14   Bates.
15              This is your deposition under oath in
16   that litigation.  This is your sworn testimony.  It
17   can be used in the litigation for many purposes;
18   almost any purpose, as your attorney will
19   undoubtedly advise you.  The purpose of this
20   deposition is for me to ask questions and you to
21   answer them.
22              If at any time you don't understand a
23   question that I ask, please let me know.  My object
24   here is not to create confusion.  So if you don't

 1   objection.
 2           MR. ZAVIN:  What is objectionable about the
 3   form?
 4           MR. PARKS:  This continues a litany of similar
 5   questions that suggests answers and constitute your
 6   attempt to testify on behalf of this witness.  It
 7   has continued for some time.  It's continuing now.
 8           MR. ZAVIN:  Are you suggesting --
 9           MR. PARKS:  I don't like the form of the
10   question and, therefore, I object to it.
11   BY MR. ZAVIN:
12      Q.    Okay.  Mr. Bates, do you have any reason
13   to think you didn't receive this e-mail?
14      A.    I think that was asked the exact same
15   way.  But I have no recollection, as I stated
16   before.  Hundreds of e-mails a day.  Open some,
17   don't open others.  And I tend to cherry-pick people
18   that are important to me and ventures that are
19   viable.  So chances are, even though I don't recall,
20   who knows?
21      Q.    Were there negotiations ongoing with TVN
22   in the late winter or early spring of 2012?
23      A.    Great question.  And thank you for asking
24   it.  Which TVN is obviously -- was an important

1  piece of the puzzle.  As evidenced by the e-mail
2  chain, I was never involved.  There were meetings
3  that occurred.  I was never there.
4           As I stated earlier in my testimony, I
5  haven't been in the office in over a year.  So if
6  there were negotiations going on, I was peripherally
7  notified, in passing, whether it be via an e-mail
8  like this that I may or may not have read or in a
9  once every couple, three months meeting as I
10 testified to, that I probably met with Nunzio a
11 handful of times.
12          So thank you for demonstrating the fact
13 that this is a major opportunity, as Tony describes,
14 but I had nothing to do with.
15 BY MR. ZAVIN:
16      Q.   Now I'll ask the question again.
17           Were there negotiations ongoing with TVN
18 in late spring or early winter -- late winter or
19 early spring of 2012?
20      A.   It appears so.
21      Q.   What is TVN?
22      A.   What is TVN?
23      Q.   Yeah.
24      A.   It's a content.

1        A.    Well, I think it's important to know.

2        MR. PARKS:  Dylan --

3   BY MR. ZAVIN:

4        Q.    Mr. Bates, would it make a difference as

5   to whether -- how it was sent, whether you knew

6   about it?

7        MR. PARKS:  I object to the form of that

8   question.

9        Wait, let -- Mr. Bates, let Mr. Zavin pose the

10  question.

11       THE WITNESS:  All right.  I'll stop being an

12  attorney.

13  BY MR. ZAVIN:

14       Q.    Well, let's follow up on that, Mr. Bates.

15  If it was e-mailed, would it make a difference

16  whether you knew about it?

17       A.    Not necessarily.  That's not where I was

18  going with that.

19       MR. STECK:  That's interesting, but that's not

20  the question.  But obviously, the forms of delivery

21  differ in the time they get places.

22       THE WITNESS:  That was the context.

23  BY MR. ZAVIN:

24       Q.    Did you ever know about that letter?

1     A.   I have no idea, as I've testified.

2     MR. ZAVIN:  Okay.  Let's mark this as

3 Exhibit 33.

4            (WHEREUPON, a certain document was

5            marked Plaintiffs' Deposition

6            Exhibit No. 33, for identification,

7            as of September 5, 2012.)

8            (WHEREUPON, the document was

9            tendered to the witness.)

10 BY MR. ZAVIN:

11     Q.   Marked as Plaintiffs' Exhibit 33 is

12 another letter from Mr. Rothenberg, this one dated

13 May 16, 2012, to Mr. Hoti and also to Mr. Steck.

14        Have you ever seen this letter?

15     A.   I have not.

16     Q.   Were you aware that it had been sent on

17 or around May 16?

18     A.   No.

19     Q.   Now, this letter purported -- or did

20 terminate the agreement between EuroVu and Intercom

21 Ventures with respect to all of the channels that --

22 all of the EuroVu channels that Intercom Poland was

23 broadcasting; is that correct?

24     MR. PARKS:  I object to the form of that

Case 1:12-cv-04175-AT   Document 50-5   Filed 10/05/12   Page 11 of 20

Page 140

1    question.
2         MR. STECK:  Objection to a mischaracterization
3    that this was an effective termination of any
4    agreement.
5         MR. PARKS:  And now you're again testifying in
6    relation to a document that the witness has told you
7    he's not seen.
8    BY MR. ZAVIN:
9         Q.    You can answer.
10        A.    You've got to repeat the question after
11   that.
12        Q.    Okay.  You can read this letter.  But at
13   least on its face, it purports to terminate Intercom
14   Ventures and, therefore, Intercom Poland's right to
15   broadcast all of the EuroVu channels.  Would you
16   agree with that?
17        MR. PARKS:  I object to the form of that
18   question.  That asks for legal conclusions on behalf
19   of a lay witness with regard to a document that he's
20   just testified he's not seen.
21        MR. STECK:  I'll join in that objection, also,
22   to any factual conclusions that are implied.
23   BY MR. ZAVIN:
24        Q.    You can answer the question.

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

1      A.    Okay.  Now repeat the question, please.
2      MR. ZAVIN:  Why don't you read the question
3 back.  You don't have to read the objection back.
4      And we'll assume that you're objecting to it
5 again on its rereading.
6           (WHEREUPON, the record was read by
7            the reporter.)
8 BY THE WITNESS:
9      A.    I'm not an attorney.  I don't know.
10 BY MR. ZAVIN:
11     Q.    Okay.  Were you ever told that EuroVu had
12 terminated the license with Intercom Ventures and
13 demanded that Intercom Ventures and Intercom Poland
14 cease broadcasting Intercom's -- EuroVu's channels?
15     A.    No -- well, after the fact.
16     Q.    Well, how long after the fact?
17     A.    I have no idea.
18     Q.    A day?  Two days?  A month?
19     A.    I at multiple times had Bob calling me; I
20 never took the call.  I had Tony call me; never took
21 the call until well into this.  I got drug back into
22 this multiple days after this fact.
23     Q.    Well, when you say "multiple days," do
24 you have any recollection of how you learned that

1    EuroVu had purported to terminate the license?
2         A.    It was a day or two before I talked to
3    Bob, which was sometime in June.
4         Q.    So you're saying you didn't know until
5    June that EuroVu had terminated the license?
6         A.    I've never seen this document.
7         Q.    I just want to ask.  I'm asking you when
8    you learned that EuroVu had terminated the license?
9         A.    As I've said multiple times before, I was
10   well aware that the entity had financial issues.
11   We've looked at three or four other documents very
12   similar to this.  So did I hear, peripherally?  Once
13   again, as I've stated numerous times in my
14   testimony, that there were financial issues and
15   there was bickering going on between Bob and Tony,
16   Bob and Nunzio about payables.
17              Specific line in the sand that says, this
18   is the date that -- that now you're in breach of
19   this agreement?  No.  I don't recall when I found
20   out about that, but it was significantly after the
21   fact on May 18th at midnight, supposedly when this
22   thing dropped dead.  I knew nothing about it up
23   until that point.  Nothing.  I was not copied on
24   this letter.  I've never seen it.

Page 143

1     Q.   Okay.  And you're claiming you were never
2  told about it?
3     A.   I was never told about this letter.
4     MR. ZAVIN:  Okay.  Let's mark this as
5  Plaintiffs' Exhibit 34.
6              (WHEREUPON, a certain document was
7               marked Plaintiffs' Deposition
8               Exhibit No. 34, for identification,
9               as of September 5, 2012.)
10              (WHEREUPON, the document was
11               tendered to the witness.)
12  BY MR. ZAVIN:
13     Q.   This is a two-page e-mail, Bates stamp
14  number DB0002957 through 2958, which appears to be
15  from Mr. Hoti to you, dated May 19, 2012, on a
16  Saturday.
17          Do you recognize that e-mail?
18     A.   Vaguely.
19     Q.   When you say "vaguely," did you receive
20  that e-mail on May 19, 2012?
21     A.   I have no idea.  I might have read it on
22  Wednesday.  I have no idea.
23     Q.   In this e-mail, Mr. Hoti says that he
24  told Bob that you would be contacting him either

1        A.    It's not in the document.
2        Q.    Okay.  In paragraph 28, you say that
3   litigating in New York would pose significant
4   financial and personal burdens on me.  Do you see
5   that?
6        A.    I do.
7        Q.    I it fair to say, Mr. Bates, that you are
8   a relatively wealthy man?
9        MR. PARKS:  Object to form.
10  BY MR. ZAVIN:
11       Q.    I want to know what the financial burden
12  of litigating in New York is on you?
13       A.    Time away from my business, travel costs.
14  And I could tell you my -- my business is extremely
15  profitable on a daily basis, on an hourly basis.  So
16  one minute away from the office costs me money,
17  including the tens of thousands of dollars this has
18  already wasted.
19       Q.    But why would it be more of a financial
20  burden on you to litigate in New York than in
21  Chicago?
22       A.    The -- did I not make myself clear?
23  New York is 790 miles away.  There's travel
24  involved.  There's logistics involved.  I'm being

1   away from my family and my work for extended periods
2   of time.  I've never -- never been to New York in
3   relation to this business.
4              I've been in New York two or three times
5   my entire life to present to Moody's and S&P for my
6   core business to get rated.  And I went to one
7   Yankee game, one Yankee/White Sox game, the -- one
8   of the last series at the old Yankee stadium.  Flew
9   into Teterboro, flew out.  That's my extent of my
10  time in New York.  So I don't understand how this
11  makes sense to have me show up in New York for this
12  case, whatsoever.
13       Q.    So it would be easier for you to litigate
14  this in Chicago?
15       A.    I don't belong in this case to begin
16  with.
17       Q.    Well, you understand that the only thing
18  this motion does is that -- it doesn't get you out
19  of this case.  The case can be refiled against you
20  in Chicago.  Do you understand that what you've made
21  here is a jurisdictional motion?
22       MR. PARKS:  I object to the form of the
23  question.
24       MR. STECK:  I object to the form of the

1    question.
2    BY MR. ZAVIN:
3        Q.   Do you understand what you have -- what
4    this motion entails?
5        MR. STECK:  I object to you instructing him --
6        MR. PARKS:  I object to form.
7        MR. STECK:  -- on what the law is and --
8    BY MR. ZAVIN:
9        Q.   Do you understand what the thrust of this
10   motion is that you've made?
11       A.   I do.
12       Q.   And which is?
13       THE WITNESS:  Do you want me to answer the
14   question?
15       MR. PARKS:  Yes, you can.
16   BY THE WITNESS:
17       A.   I don't belong in the case personally,
18   and it doesn't -- and if, and only if, that were to
19   be the case where I did belong, let's put the
20   jurisdiction -- I have nothing to do with New York.
21   As I said, I've been there two or three times my
22   entire life; have never traveled -- traveled there
23   in the course of this business; and it wouldn't make
24   sense.

1          So I think it's a two-pronged motion,
2     from my perspective.  I don't belong in this case
3     personally, as I did not have operational control
4     and/or involvement on a day-to-day basis and/or
5     directing people to do things alleged in this
6     Complaint.  Second of all, I haven't been to
7     New York in connection to this; and it doesn't make
8     sense.
9     BY MR. ZAVIN:
10         Q.    The partner in the operating agreement, I
11    think you testified before -- and I'm not trying
12    to -- this isn't a memory test.  You can look back
13    at it -- I think one of your joint venture partners
14    is Intercom Ventures Poland.  Was that the partner
15    in the operating agreement?
16         MR. STECK:  I object to the question.  There
17    was no reference or foundation.
18         MR. ZAVIN:  Well, I'm not trying to trick him.
19    BY MR. ZAVIN:
20         Q.    I'm saying that you can look back at the
21    document.
22         A.    The operating agreement for Intercom
23    Poland?
24         Q.    For Intercom Poland.

```
                                                          Page 191
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4    SPANSKI ENTERPRISES, INC.   )
 5    and EUROVU, S.A.,           )
 6              Plaintiffs,       )     Case No.
 7        vs.                     )     12 CV 4175 (WHP)
 8    INTERCOM VENTURES, LLC,     )     ECF CASE
 9    INTERCOM POLAND, LLC, TONY  )
10    HOTI AND DYLAN BATES,       )
11              Defendants.       )
12
13              I hereby certify that I have read the
14    foregoing transcript of my deposition given at the
15    time and place aforesaid, consisting of Pages 1 to
16    184, inclusive, and I do again subscribe and make
17    oath that the same is a true, correct and complete
18    transcript of my deposition so given as aforesaid,
19    and includes changes, if any, so made by me.
20                           DYLAN PAUL BATES
21    SUBSCRIBED AND SWORN TO
22    before me this 18th day          OFFICIAL SEAL
                                       SUSAN G PANKOW
                                NOTARY PUBLIC, STATE OF ILLINOIS
                                 MY COMMISSION EXPIRES 10/02/2015
23    of September , A.D. 2012.
24        Notary Public     Susan G. Pankow
```

Page 192

1                   DEPOSITION ERRATA SHEET

2

3     Assignment No. 8148

4     Case Caption:  SPANSKI ENTERPRISES, INC., et al., v.

5     INTERCOM VENTURES, LLC, et al.

6

7              DECLARATION UNDER PENALTY OF PERJURY

8          I declare under penalty of perjury that I have

9     read the entire transcript of my Deposition taken in

10    the captioned matter or the same has been read to

11    me, and the same is true and accurate, save and

12    except for changes and/or corrections, if any, as

13    indicated by me on the DEPOSITION ERRATA SHEET

14    hereof, with the understanding that I offer these

15    changes as if still under oath.

16              Signed on the  18th  day of

17    September, 2012.

18    _____

19              DYLAN PAUL BATES

20

21

22

23

24